**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 15a0286n.06

No. 13–2269

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Apr 15, 2015

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| CONSOLIDATED RAIL CORPORATION and NORFOLK SOUTHERN RAILWAY COMPANY, | ) ) | |
| Plaintiffs-Appellees, | ) | |
| | ) | |
| CSX TRANSPORTATION, INC., | ) | |
| Third-Party Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| GRAND TRUNK WESTERN RAILROAD COMPANY, | ) ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |

**BEFORE: DAUGHTREY, McKEAGUE, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Grand Trunk Western Railroad Company (GTW) appeals a jury verdict in favor of Plaintiffs Consolidated Rail Corporation (Conrail) and Norfolk Southern Railway Company (NS) and Third-Party Defendant CSX Transportation, Inc. (CSX), and the denial of its post-judgment motion for judgment as a matter of law, a new trial, or remittitur, in this action arising from a dispute regarding the right to cross and use a segment of GTW's railroad track. We AFFIRM.

## BACKGROUND

### A. The 1897 Agreement

Beginning in 1873, Conrail[1] operated parallel railroad tracks that ran south from Trenton, Michigan, and north to Detroit, Michigan. In 1897, GTW sought to extend its existing tracks northeastward to Detroit via two railroad tracks that would, in areas relevant here, flank Conrail's existing tracks before crossing the Conrail tracks in the vicinity of Trenton (FN Interlocking) and then continue to flank Conrail's tracks, north towards Detroit. The resulting GTW tracks would block Conrail's access to areas east and west of Conrail's tracks near Trenton.

To construct the interlocking system GTW had to obtain permission to cross Conrail's tracks. In exchange for this permission, Conrail sought to preserve its ability to reach locations in the Trenton area by securing the right to cross GTW's tracks. The parties thus entered into the November 11, 1897 Agreement (1897 Agreement), which allowed GTW to install its interlocking system "at or near Trenton" in order to cross Conrail's tracks. The 1897 Agreement also identified a segment of GTW's new track that Conrail could cross at any point to reach Trenton-area destinations to the east and west, and contained provisions authorizing Conrail to build additional tracks that would cross over the GTW tracks. The agreement was executed, and GTW built the tracks as proposed.

---

[1] Because the timing of the transfer of ownership from Conrail's predecessors, the Detroit, Monroe, and Toledo Railroad Company and the Toledo, Canada Southern & Detroit Railroad Company, to Conrail is unimportant, we will refer to Conrail's predecessors as Conrail. Similarly, because the timing of the transfer from GTW's predecessors, the Detroit, Lima & Northern Railway and Shoreline Railroad, to GTW is unimportant, we will refer to GTW's predecessors as GTW.

### B. The Trackage Rights Agreement

Since the mid-1970s, Huron Valley Steel (HVS), also known as Trenton Steel Storage and Processing (Trenton Steel Storage), has owned and operated a steel-processing facility on a contiguous, 85-acre parcel of land in Trenton. In 1993, Conrail attempted to exercise its rights under the 1897 Agreement to build its own crossing over GTW's track to deliver freight to HVS. Specifically, Conrail informed GTW that it would "cross the GTW tracks to access existing or new industry on [Conrail's] Detroit-Toledo corridor." Although HVS had its own private track, known as the "private industry track," Conrail needed to cross a portion of GTW's tracks to gain access to the HVS track. Conrail initially proposed building its own specialty track over GTW's lines to effectuate the crossing.

GTW rejected these requests as beyond the scope of Conrail's rights under the 1897 Agreement and a dispute ensued. GTW and Conrail agreed to arbitrate the issue whether the 1897 Agreement permitted Conrail's proposed crossing of the GTW track. Further, GTW and Conrail agreed in June 1994 that should Conrail prevail in the arbitration, GTW would allow Conrail to use its existing track rather than have Conrail install its own crossing diamond, a type of special track, to access the "premises" (1994 Arbitration Agreement or 1994 Agreement). Specifically, the agreement provided:

> In the event the arbitrators decide that Conrail may cross GTW to serve Trenton Steel Warehouse, GTW will permit Conrail immediate access to Trenton Steel Warehouse. GTW agrees that Conrail will effect the crossing and access to Trenton Steel Warehouse by operating over GTW trackage to the extent necessary to cross from Conrail's right-of-way to the premises of Trenton Steel Warehouse in an operationally practicable and efficient way that is consonant with Conrail's desire to provide rail service. . . .

The 1994 Agreement defined "Trenton Steel Warehouse" as "the facility of Trenton Steel Processing and Storage, d/b/a Huron Valley Steel Corporation (and its successors and assigns) ("Trenton Steel Warehouse"), located in the Trenton Commercial Industrial Park."

On January 21, 1996, the arbitrators found in favor of Conrail. After negotiations over the specific language of the agreement, GTW and Conrail executed the Trackage Rights Agreement (TRA) on May 1, 1996. As explained by David Wilson, former GTW Vice President of Operations, a trackage rights agreement is usually an agreement that allows one railroad to traverse over the track of another railroad from a "Point A" to "Point B." The TRA granted "Conrail the right to operate its trains, locomotives, cars, and equipment" over designated sections of GTW's track in the Trenton area (Trackage Rights). The section of track designated for Conrail's use was named the "Trackage." The TRA further specified that the "Trackage Rights" are "for the sole purpose of serving Trenton Steel Warehouse or its successor." However, the TRA does not define "Trenton Steel Warehouse."

### C. Surface Transportation Board Decision No. 89

A year after the TRA was executed, the Surface Transportation Board (STB) issued Decision 89, approving NS' and CSX's acquisition of Conrail. *CSX Corp. & CSX Transp., Inc., Norfolk S. Corp. & Norfolk S. Ry. Co. Control & Operating Leases/agreements-Conrail Inc. & Consol. Rail Corp.,* 3 S.T.B. 196 page 5 (1998) (Decision 89) ("except as otherwise indicated, we are approving the primary application in its entirety"). Congress established the STB in 1996 to assume some of the regulatory functions that had been administered by the Interstate Commerce Commission (ICC) before the ICC was abolished. STB Website, *Overview of the STB*, http://www.stb.dot.gov/stb/about/overview.html ("The STB is an economic regulatory

4

agency that Congress charged with resolving railroad rate and service disputes and reviewing proposed railroad mergers."). The STB now has jurisdiction over a range of disputes related to railroads, including approving all mergers of Class I railroads and preserving competition between railroads that merge:

> The Board shall approve and authorize a transaction under this section when it finds the transaction is consistent with the public interest. The Board may impose conditions governing the transaction, including the divestiture of parallel tracks or requiring the granting of trackage rights and access to other facilities. *Any trackage rights and related conditions imposed to alleviate anticompetitive effects of the transaction shall provide for operating terms and compensation levels to ensure that such effects are alleviated.*

49 U.S.C.A. § 11324(c) (emphasis added). GTW does not challenge the STB's authority to supersede anti-assignment provisions in merger contracts and effectively render one party an assignee of another.[2]

In Decision 89, the STB determined that Conrail would exist solely as an agent for NS and CSX:

> It is intended that, following the Division: [Conrail] will not hold itself out to the public as performing transportation services directly and for its own account; [Conrail] will not enter into any contract (other than with [CSX] or [NS]) for the performance of transportation services; and all transportation services performed by [Conrail] will be performed as agent or subcontractor of [CSX] or [NS].[3]

---

[2] GTW claims instead that the STB would not have "reform[ed] trackage rights agreements under its general merger and acquisition authority to add two additional parties to each such agreement" without "an extensive discussion as to its reasons, the basis for its authority, and the rights of other parties to those agreements." However, this is what Decision 89 did, and it did so because the "two additional parties" were acquiring, and thus stepping into the shoes of, the original party.

[3] Though this language is taken from the STB's summary of NS and CSX's merger application, the STB went on to order that "the application filed … is approved, subject to the

Further, certain Conrail assets, including those at issue here, were designated "Shared Asset Areas" and subject to "Shared Asset Agreements" (SAAs) to facilitate competition between NS and CSX.

Decision 89 also explicitly superseded the anti-assignment clauses contained in agreements to which Conrail was party. "With one exception [unrelated to the present appeal], we are approving applicants' request to override antiassignment and other similar clauses in Conrail's Trackage Agreements." Decision 89 further declared:

> CSX and NS will have the authority to conduct operations over the routes of Conrail covered by the Trackage Agreements as fully and to the same extent as Conrail itself could, whether or not such routes are listed in [the appendices and other related documents], and notwithstanding any clause in any such agreement purporting to limit or prohibit unilateral assignment by Conrail of its rights thereunder.

### D. The Shared Assets Area Operating Agreement for Detroit

The SAA governing Detroit (Detroit SAA) provides that

> [b]oth [CSX] and [NS] will be permitted to serve shipper facilities located within the three SAAs. . ., which will be owned, operated, and maintained by Conrail for the exclusive benefit of CSX and NS. CSX and NS will enter into an SAA Operating Agreement with [Conrail] in connection with each of the SAAs.

Consequently, Conrail's movements within the Detroit SAA are "at the request of and as agent for [NS or CSX]."

---

imposition of conditions discussed." None of those conditions touched on the agent-principal relationship set forth in the merger application.

## E. Circumstances precipitating Conrail's Complaint

In October 2001, E.C. Korneffel Company (Korneffel) purchased a portion of the contiguous 85-acre Trenton Steel Warehouse property from HVS. Korneffel purchased this tract of land because it would give it "the ability to use the existing [HVS] rail facility and to expand the rail facility onto the property we bought." In addition to the property itself, HVS granted Korneffel a permanent easement over HVS property to allow Korneffel to build its own sidetrack off of HVS's private industry track and granted Korneffel a limited, revocable license to use HVS' line until its own sidetrack was constructed.

Subsequently, Korneffel entered into freight-delivery agreements with both Conrail and GTW. Once GTW became aware that Conrail was delivering freight to Korneffel, it locked the tracks so that additional Conrail cars were prevented from crossing. In total, twenty-six rail cars carrying steel beams were prevented from reaching Korneffel.[4]

Conrail brought an action against GTW for breach of the 1897 crossing agreement. Neither NS nor CSX was a party to the first complaint. GTW counterclaimed for breach of the TRA, claiming that Conrail had no right to use GTW trackage to deliver to Korneffel. In the Second Amended Complaint, Conrail and NS asserted a breach of the agreement to arbitrate executed by Conrail and GTW. The district court then granted Conrail's and NS's motion for leave to file a Third-Amended Complaint that alleged that GTW breached the TRA when it

---

[4] There is evidence in the record that GTW rail workers were aware that Conrail was servicing Korneffel using the trackage and that some GTW workers permitted the usage pursuant to the TRA. But GTW asserts that its management was never made aware of the agreement between Conrail and Korneffel and the resulting usage.

locked the tracks. GTW in turn filed a third-party complaint against CSX,[5] and CSX counterclaimed against GTW for breach of the TRA. Conrail argued that the meaning of "Trenton Steel Warehouse," the only location the TRA permitted Conrail to service using GTW trackage, was latently ambiguous. Conrail offered testimony demonstrating that there were multiple understandings of what "Trenton Steel Warehouse" referred to and that none was as narrow as GTW suggested. GTW sought to have this testimony excluded as inadmissible parol evidence, but the district court ruled in favor of Conrail and considered the testimony. Both sides moved for summary judgment. However, the district court found a material dispute regarding the meaning of "Trenton Steel Warehouse," and thus whether Conrail, on behalf of NS, had the authority to use the GTW trackage to deliver freight to Korneffel.

At trial, a jury determined that Conrail had the right to use the GTW trackage to service Korneffel and awarded NS $39,816.80 and CSX $189,351.76. In addition to the jury trial, the court held a concurrent bench trial on the declaratory judgment claim and entered a declaratory judgment in favor of NS, CSX, and Conrail.

On August 12, 2013, GTW filed a motion for judgment as a matter of law, or in the alternative, for a new trial or remittitur, which the district court denied. This appeal followed.

## DISCUSSION

### I. NS and CSX's Standing to Assert Damage Claims Under the TRA

GTW first asserts that NS and CSX lack standing to bring a claim for damages under the TRA. We review *de novo* the district court's determination that NS and CSX had standing to

---

[5] GTW's complaint contained general allegations that CSX, along with Conrail and NS, impermissibly used GTW track to make deliveries to Korneffel. GTW further requested a declaratory judgment regarding the parties' respective rights under the TRA.

bring damages claims. *United States v. Real Prop., All Furnishings Known as Bridwell's Grocery*, 195 F.3d 819, 821 (6th Cir. 1999). GTW argues that NS and CSX have no right to claim independent contract damages under the TRA because they were not parties to the TRA, intended third-party beneficiaries of the TRA, or assignees of Conrail's rights under the TRA. This argument fails.

In its decision to approve NS' and CSX's acquisition of Conrail, the STB unequivocally overrode all but one anti-assignment clause in Conrail's existing contracts. "With one exception [unrelated to the present appeal], we are approving applicants' request to override antiassignment and other similar clauses in Conrail's Trackage Agreements." Further, Decision 89 made clear that the acquisition would result in Conrail's conversion to a mere agent of NS and CSX without the right to enter into contracts on its own: "It is intended that . . . [Conrail] will not hold itself out to the public as performing transportation services directly and for its own account; [Conrail] will not enter into any contract (other than with [CSX] or [NS]) for the performance of transportation services; and all transportation services performed by [Conrail] will be performed as agent or subcontractor of [CSX] or [NS]." Thus in Decision 89 the STB effectively assigned Conrail's rights to CSX and NS. [6]

---

[6] Moreover, the TRA itself allows for the assignment of the trackage rights to purchasers of the railroad properties, even without the STB's override of the TRA anti-assignment clause:

> This Agreement shall inure to the benefit of and be binding upon the successors and assigns of the parties hereto, including, without limitation, the successors and assigns of GTW's interest in the Trackage or any portion thereof. Neither party hereto shall transfer or assign this Agreement, or any of its rights, interests or obligations hereunder, to any person, firm, or corporation without obtaining the prior written consent of the other party to this Agreement; provided, however, that such consent shall not be necessary if such transfer or assignment is to a purchaser, successor or

## II.     STB's Primary Jurisdiction

In the alternative, GTW argues that primary jurisdiction lies with the STB and this court should abstain from ruling and instead refer the dispute to the STB.  "The doctrine of primary jurisdiction arises when a claim is properly cognizable in court but contains some issue within the special competence of an administrative agency." *United States v. Haun*, 124 F.3d 745, 749-50 (6th Cir. 1997).

This court has not articulated a standard of review specific to reviewing district-court rulings regarding primary jurisdiction;[7] in cases where the issue has arisen, we have reviewed the district court's decision *de novo*.  *See id*. at 747.  Although the STB has the exclusive authority to approve, authorize, and supervise railroad transactions such as sales, leases, consolidations, and mergers under 49 U.S.C.A. § 11321, Congress explicitly authorized concurrent jurisdiction of the STB and the federal courts for most other railroad-related disputes.  *See, e.g.*, 49 U.S.C.A. § 11704 ("A person may file a complaint with the Board under section 11701(b) of this title or bring a civil action under subsection (b) of this section to enforce liability against a rail carrier

---

assign of all or substantially all of the rail properties of one of the parties or to a purchaser, successor or assign of GTW's interest in the Trackage or any portion thereof.

TRA Art. 15.  In this case, NS and CSX acquired 58% and 42%, respectively, of most of Conrail's assets and joint control of the retained assets, shared according to the SAAs for the respective geographic regions.  Therefore, because NS and CSX jointly acquired Conrail and its physical assets, assignment of the TRA to them was permissible.

[7] Aaron J. Lockwood, *The Primary Jurisdiction Doctrine: Competing Standards of Appellate Review*, 64 Wash. & Lee L. Rev. 707, 721 (2007) (in which the author summarized the standards of review employed by the circuits, noting that the Sixth Circuit Court of Appeals has yet to determine a specific standard for primary jurisdiction).

providing transportation subject to the jurisdiction of the Board under this part"); 49 U.S.C.A. § 11704 (same); *Pejepscot Indus. Park*, *Inc. v. Maine Cent. R. Co*., 215 F.3d 195, 201 (1st Cir. 2000) (holding that congress intended to authorize concurrent STB and federal district court jurisdiction over Interstate Commerce Commission Termination Act).

In cases of concurrent jurisdiction, the Supreme Court has held that "[n]o fixed formula exists for applying the doctrine of primary jurisdiction." *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 64 (1956). The purpose of the doctrine of primary jurisdiction is to "obtain the benefit of the expertise and experience of the administrative agencies and the desirable uniformity which occurs when a specialized agency decides certain administrative questions." *Alltel Tennessee, Inc. v. Tenn. Pub. Serv. Comm'n*, 913 F.2d 305, 309 (6th Cir. 1990). Further, "[a] court must apply the doctrine of primary jurisdiction on a case-by-case basis, deferring to an administrative agency only when the reasons for the existence of the doctrine are present." *Id*.

GTW contends that the STB should decide this contract dispute because it involves interpretation of Decision 89 and the related SAAs. However, the STB considered the Conrail acquisition and issued the lengthy Decision 89 approving and conditioning the merger. Decision 89 contains provisions that unequivocally override anti-assignment clauses in Conrail agreements such as the TRA.

The STB further determined that Conrail movements within the Detroit Shared Asset Area are for the purposes of NS and/or CSX, thus rendering Conrail an agent of NS and CSX. Because the STB has unambiguously spoken regarding the issues relevant to this appeal, and the district court plainly applied the STB provisions regarding assignments, there is no need to send

the dispute back to the STB.[8] Moreover, there is no concern that conflicting decisions will result from the district court issuing a decision rather than the STB. Accordingly, this court may adjudicate this contract dispute.

### III. Summary Judgment in Favor of GTW, New Trial, Judgment as a Matter of Law and/or Declaratory Judgment

#### A. Summary Judgment

GTW contends that the language of the TRA unambiguously demonstrates that Conrail's service to Korneffel was impermissible and therefore that the district court erred by not granting summary judgment in its favor. The TRA permits Conrail to use the trackage "for the sole purpose of serving Trenton Steel Warehouse." TRA Section 1. GTW contends that the term "Trenton Steel Warehouse" clearly refers to the physical warehouse building located on the HVS property, or its owner, HVS, and that if either of these two definitions applies, Conrail was in violation of the TRA when it served Korneffel on behalf of NS.

Conrail, NS, and CSX respond that the term "Trenton Steel Warehouse" refers to the entire 85-acre parcel owned by HVS and used for Trenton Steel Storage at the time the TRA was

---

[8] Decision 89 has been considered and interpreted by federal courts a number of times. *See, e.g.*, *Hall v. Norfolk S. Ry. Co.*, 2003 WL 23018523 (N.D. Ind. Dec. 5, 2003) *aff'd*, 469 F.3d 590 (7th Cir. 2006) (interprets Decision 89 and grants Defendant NS's motion for summary judgment) and *Weaver v. Conrail, Inc.*, 2010 WL 2773382 (E.D. Pa. July 13, 2010) (court takes judicial notice of Decision 89, which supports Conrail's defenses to a negligence claim). In *AT & T Commc'ns, Inc. v. Consol. Rail Corp.*, 285 F. Supp. 2d 649, 653 (E.D. Pa. 2003), the district court referred preemption issues unaddressed in Decision 89 to the STB. In this dispute, however, there are no similar concerns yet to be considered by the STB. Further review of Decision 89 has also been denied on appeal. *Erie-Niagara Rail Steering Comm. v. Surface Transp. Bd.*, 247 F.3d 437 (2d Cir. 2001) (finding that STB did not act arbitrarily or capriciously and denying all petitions for review of Decision 89); *Com. of Pennsylvania v. Surface Transp. Bd.*, 290 F.3d 522 (3d Cir. 2002) (same).

executed, or, alternatively, that "Trenton Steel Warehouse" was another name for HVS, which would render service to Korneffel via the HVS private industry track permissible because that track was beyond the scope of the TRA, [9] and that, at best, the term is ambiguous.

We review *de novo* a district court's denial of summary judgment. *Int'l Union v. Cummins, LLC*, 434 F.3d 478, 483 (6th Cir. 2006). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Cummings v. City of Akron*, 418 F.3d 676, 682 (6th Cir. 2005). In considering a motion for summary judgment, the district court must construe all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The term "Trenton Steel Warehouse" appears four times in the TRA. It appears twice in the TRA's titles—"Trackage Rights Agreement Between [GTW] and [Conrail] to Service Trenton Steel Warehouse" and "General Conditions to Trackage Rights Agreement Dated as of May 1, 1996, Between [GTW] and [Conrail] Related to Service Trenton Steel Warehouse at Trenton, Michigan"—once in the body of the TRA, and once on an exhibit attached to the TRA. Without additional context, the use of "Trenton Steel Warehouse" in the titles provides no insight into the meaning of the term. Section 1 of the TRA states: "[Defendant] hereby grants to

---

[9] David Wilson explained that a trackage rights agreement is usually an agreement that allows one railroad to traverse over the track of another railroad from a "Point A" to "Point B." Any restrictions that may be imposed by the trackage agreement cease after "Point B" is reached. Plaintiffs argue that if Conrail freight deliveries to the HVS private industry track are permitted by a TRA, further movements of that freight after delivery are not limited by the TRA.

[Plaintiffs] the right to operate. . . in either direction over the following segments of [Defendant]'s railroad for the sole purpose of serving Trenton Steel Warehouse or its successor (hereinafter referred to as 'Industry'), shown on the plan attached hereto, made a part hereof and marked 'Exhibit A' (hereinafter referred to as the 'Trackage')." That the right is granted to serve "Trenton Steel Warehouse or its successor" suggests that Trenton Steel Warehouse could be an entity. Finally, "Trenton Steel Warehouse" is written in a box on the plan attached as Exhibit A to the TRA. The plan shows the location of the various tracks in relation to the streets and property lines. There is a rectangle labelled "Trenton Steel Warehouse" shown in relation to the property line. But it is clear from other exhibits that the rectangle does not accurately reflect the location of the actual warehouse building in relation to the trackage. Thus the label "Trenton Steel Warehouse" on Exhibit A does not unambiguously support that "Trenton Steel Warehouse" refers to the actual warehouse building rather than the property of "Trenton Steel Warehouse." The TRA does not provide an unambiguous definition of "Trenton Steel Warehouse," and appears to suggest three plausible meanings of "Trenton Steel Warehouse"—the actual warehouse building located on the HVS property, the company doing business on the tract of land, or the entire 85-acre parcel of land owned by HVS and used for Trenton Steel Warehouse at the time the TRA was finalized. Because the TRA is ambiguous, the district court properly denied GTW's motion for summary judgment. [10]

---

[10] We also note that the 1994 Arbitration Agreement expressly defined "Trenton Steel Warehouse" as "the facility of Trenton Steel Processing and Storage, d/b/a Huron Valley Steel Corporation (and its successors and assigns) ('Trenton Steel Warehouse'), located in the Trenton Commercial Industrial Park." However, this language fails to illuminate the meaning of "Trenton Steel Warehouse" as it is used in the TRA. First, the TRA did not expressly incorporate the 1994 Agreement by reference. Thus, it is unclear whether, or to what extent, the

**B. New Trial for GTW**

GTW argues it is entitled to a new trial because the testimony of former GTW Vice President David Wilson and former General Manager of Contracts for Conrail Paul Carey was improper parol evidence. After considering GTW's motions in limine to exclude the testimony, the district court allowed Wilson and Carey to testify regarding their understandings of the meaning of "Trenton Steel Warehouse," allowed Wilson to testify to his understanding of the scope of the arbitration proceedings and agreement, and allowed Carey to testify about his understanding of the TRA itself. GTW maintains that because the TRA was unambiguous, no extrinsic evidence should have been permitted. Moreover, GTW contends that even if the TRA is ambiguous, Michigan's objective theory of contract interpretation would preclude the admission of such subjective intent.

Under Michigan contract law, "[i]t is well established that where a written contract is clear and unambiguous, parol evidence of prior negotiations and representations cannot be adduced to. . .vary the terms of the contract." *Salzman v. Maldaver*, 24 N.W.2d 161, 164 (Mich. 1946). There are two types of ambiguity in contracts, patent and latent:

> A patent ambiguity is one that clearly appears on the face of a document, arising from the language itself. Accordingly, resort to extrinsic evidence is unnecessary to detect a patent ambiguity. A latent ambiguity, however, is one that does not readily appear in the language of a document, but instead arises from a collateral matter when the document's terms are applied or executed. Because the detection of a latent ambiguity requires a consideration of factors outside the instrument itself,

---

TRA adopted the 1994 definition. Second, even if the TRA did adopt the 1994 definition, that definition is also unclear, and could be understood to refer only to HVS's actual warehouse, or alternatively, to those facilities belonging to HVS, including the HVS private industry track.

> extrinsic evidence is obviously admissible to prove the existence of the ambiguity, as well as to resolve any ambiguity proven to exist.

*City of Grosse Pointe Park v. Michigan Mun. Liab. & Prop. Pool,* 702 N.W.2d 106, 113 (Mich. 2005) (internal citations and quotations omitted). Here, the district court found the term "Trenton Steel Warehouse" latently ambiguous, as the ambiguity it creates "arises not upon the words of the will, deed or other instrument, as looked at in themselves, but upon those words when applied to the object or to the subject which they describe." *Shay v. Aldrich*, 790 N.W.2d 629, 641 (Mich. 2010) (internal citations and quotations omitted). Given that the term "Trenton Steel Warehouse" does not, when considering the property and the circumstances of the agreement, have one clear meaning, the district court properly admitted the testimony of the drafters in order to shed light on the meaning of this term. "The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties. To this rule all others are subordinate." *McIntosh v. Groomes*, 198 N.W. 954, 955 (Mich. 1924).

GTW further argues that even if extrinsic evidence is admissible, the testimony admitted was improper in light of Michigan's "objective theory" of contract interpretation. Michigan does employ an objective test, "looking to the expressed words of the parties and their visible acts." *Goldman v. Century Ins. Co.*, 93 N.W.2d 240 (Mich. 1958); *Stark v. Kent Prods., Inc.*, 233 N.W.2d 643 (Mich. Ct. App. 1975). However, "[i]t is proper to consider the circumstances at the time the asserted contracts were made to determine the intent of the parties." *Dumas v. Auto Club Ins. Ass'n*, 473 N.W.2d 652, 661 (Mich. 1991). Moreover, "[w]here a written contract is ambiguous. . .the fact finder must interpret the contract's terms, in light of the apparent purpose of the contract as a whole, the rules of contract construction, and extrinsic evidence of intent and

meaning*." Klapp v. United Ins. Grp. Agency, Inc*., 663 N.W.2d 447, 454 (Mich. 2003) (internal quotations and citations omitted). The evidence admitted and considered by the district court was necessary to clarify the TRA's ambiguity, and did not represent the unexpressed subjective intent of the parties. Accordingly, the district court did not abuse its discretion.

## C. Judgment as a Matter of Law

GTW next argues the district court erred in denying its motion for judgment as a matter of law. We review this ruling *de novo. Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 598 (6th Cir. 2001). "Judgment as a matter of law is appropriate when viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party." *Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 527 (6th Cir. 2005) (internal quotation marks omitted). Such a motion may be granted "only when there is a complete absence of fact to support the verdict, so that *no reasonable juror could have found for the nonmoving party*." *EEOC v. Harbert–Yeargin, Inc.*, 266 F.3d 498, 504 (6th Cir. 2001) (quoting *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1078 (6th Cir. 1999)). "[W]e do not weigh the evidence, evaluate the credibility of the witnesses, or substitute our judgment for that of the jury." *Id.* at 510 (quoting *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 825 (6th Cir. 1997). Instead, we view "the evidence in the light most favorable to the nonmoving party and decide if it was sufficient to raise a genuine issue of material fact for the jury." *Id.* We will thus affirm the jury's verdict unless we are "left with the definite and firm conviction that a mistake resulting in plain injustice has been committed, or unless the verdict is contrary to all reason." *Preferred Properties, Inc. v. Indian River Estates, Inc.*, 276 F.3d 790, 799 (6th Cir. 2002).

17

After concluding the TRA was ambiguous, the court permitted the parol testimony of former GTW and Conrail employees. This testimony provides ample support for the jury's verdict. David Wilson, GTW's former Vice President of Operations, and Paul Carey, Conrail's former General Manager of Contracts, who agreed on behalf of their respective companies to arbitrate the 1993 dispute regarding the 1897 agreement, both testified that the 1994 arbitration agreement did not limit arbitration to a specific customer or building on the HVS property.[11] Rather, the parties sought to provide Conrail with the same access it would have if it had built its own track to connect to the HVS private industry track.

Shortly after the January 1996 decision in Conrail's favor, Wilson was relieved of his responsibilities at GTW, and Paul Ladue, a GTW contracts manager under Wilson, took over the TRA negotiations. Wilson testified that he understood the "Trenton Steel Warehouse" to be the entire 85-acre HVS parcel. Further, Wilson stated that he did not instruct Ladue to reduce the size of the Trenton Steel Warehouse in the subsequent TRA negotiations. Ladue testified that he understood that the TRA conferred access only to "Trenton Steel Processing and Storage doing business as Huron Valley Steel and its building and warehouse." Carey, who signed the TRA on behalf of Conrail, testified that GTW never characterized the access to be granted to Conrail as limited to any one structure or warehouse. Carey explained that it was his understanding at the time of signing that the TRA would grant Conrail access to the entire 85-acre HVS parcel, and

---

[11] Numerous letters disputing the issue of Conrail's right to install a crossing were exchanged between Wilson of GTW and several employees of Conrail, most often Paul Carey.

that he would not have signed if that was not the case. Thus there was evidence to support the verdict and the district court did not err in denying GTW's motion.[12]

## D. Declaratory Judgment

GTW further argues that we should reverse the district court's declaratory judgment in favor of Conrail, NS and CSX, because the district court misinterpreted the TRA as allowing deliveries to multiple companies, and mistakenly admitted improper parol evidence. We review the denial of a request for injunctive or declaratory relief for abuse of discretion. *Savoie v. Martin*, 673 F.3d 488, 495 (6th Cir. 2012) (citing *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 554 (6th Cir. 2008) (declaratory relief)). "The act which authorizes federal courts to render declaratory judgments in appropriate cases confers a discretion upon the courts rather than an absolute right upon the litigant." *Omaha Prop. & Cas. Ins. Co. v. Johnson*, 923 F.2d 446, 449 (6th Cir. 1991) (internal citations and quotations omitted). Thus, "[t]he Act gives district courts discretion over whether to grant declaratory relief in a particular case." *W. Am. Ins. Co. v. Prewitt*, 208 F. App'x 393, 396 (6th Cir. 2006). The Declaratory Judgment Act provides: "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any

---

[12] In its Order Denying Grand Trunk's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for New Trial or Remittitur, the district court relied on *Douglass v. Eaton Corp.*, 956 F.2d 1339, 1340 (6th Cir. 1992), for the proposition that it could not grant a judgment notwithstanding the verdict by disregarding evidence it had admitted on the ground that the admission was error. Although GTW's argument that *Douglass* was abrogated by *Weisgram v. Marley Co.*, 528 U.S. 440 (2000), on grounds relevant to this dispute is persuasive, the challenged parol evidence was properly admitted (for the reasons discussed above) and there was sufficient evidence to support the jury's verdict.

interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

The district court declared that "Plaintiffs have the right, under the Trackage Rights Agreement to use Defendant's trackage to provide rail services to E.C. Korneffel Co. and Conrail is not liable to [GTW] for any damages." This holding was based largely on the evidence described above regarding the history of the TRA and the understandings of the parties regarding the scope of access conferred by the TRA. The 1996 TRA was not executed as a stand-alone transaction. Rather, it was the ultimate resolution of a dispute that began in 1993 and was the subject of a 1994 written agreement that anticipated the arbitration decision and from which the 1996 TRA evolved. Particularly persuasive was the testimony from representatives of both GTW and Conrail that their understanding was that the TRA was intended to provide Conrail the same access to the Trenton Steel Warehouse property as Conrail would have enjoyed had it built its own connecting track. As the district court observed,

> [t]he intent of both railroads was to provide Conrail the same access that it would have enjoyed had it gone forward with its plan to build its own track connecting the main line to the private industry track. *Testimony of David Wilson*, Tr. Vol. 3 at 53, 55-57; *Testimony of Paul Carey*, Tr. Vol. 2 at 75. Such access would include the ability to serve any customer at any location on the property that could be accessed by or from the private Huron Valley Steel track. This access would include Korneffel. *Testimony of Paul Ladue*, Tr. Vol.6 at 86; *Testimony of Paul Carey*, Tr. Vol.2 at 74, 93; *Testimony of David Wilson*, Tr. Vol. 3 at 50.

The district did not abuse its discretion by granting declaratory relief in Conrail's favor.

20

**IV**

We AFFIRM the money and declaratory judgments as well as the district court's rulings denying GTW's various motions.