**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-2482**

TAMMY A. SKIDMORE,

     Plaintiff − Appellant,

  v.

NORFOLK SOUTHERN RAILWAY COMPANY, a Virginia corporation,

     Defendant – Appellee.

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston.  Thomas E. Johnston, District Judge.  (2:18−cv−01308)

Argued:  January 27, 2021          Decided:  June 14, 2021

Before WILKINSON, AGEE, and DIAZ, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published opinion.  Judge Diaz wrote the opinion, in which Judge Wilkinson and Judge Agee joined.

**ARGUED:**  Jason Patrick Foster, THE SEGAL LAW FIRM, Charleston, West Virginia, for Appellant.  Raymond A. Atkins, SIDLEY AUSTIN LLP, Washington, D.C., for Appellee.  **ON BRIEF:**  Scott S. Segal, Robin Jean Davis, THE SEGAL LAW FIRM, Charleston, West Virginia, for Appellant.  John H. Mahaney, II, Ellen M. Jones, William C. Brown, III, DINSMORE & SHOHL LLP, Huntington, West Virginia, for Appellee.

DIAZ, Circuit Judge:

This case pits two important interests against one another: Tammy Skidmore's interest in preventing her home's foundation from eroding into the creek next to her property, and Norfolk Southern Railway Company's (and, indeed, the nation's) interest in protecting land within the national railway corridor against those who wish to adversely possess it. At this junction, however, we need only resolve whether state or federal courts must decide whose interest prevails. As we explain, the district court correctly rejected Skidmore's attempt to litigate in state court because federal law completely preempts two of Skidmore's state-law claims. But the court was wrong to then dismiss the case on the ground that it lacked subject matter jurisdiction over the claims. So we vacate the district court's judgment and remand for further proceedings.

I.

Tammy Skidmore owns a home in Kincaid, West Virginia. About 70 to 80 feet east of her home lies a set of railroad tracks owned and operated by Norfolk Southern Railway Company, which transports goods by rail throughout much of the United States. Loop Creek, a tributary of the Kanawha River, runs in between Skidmore's home and Norfolk Southern's tracks.

In 2001, Norfolk Southern secured permission from local authorities to install a culvert to drain surface water from its tracks into Loop Creek near Skidmore's home. It built the culvert to drain the water at an angle perpendicular to the direction of Loop Creek's natural flow. According to Skidmore, the water streaming from the culvert caused

2

"bars" to form in Loop Creek's riverbed, J.A. 23, which diverted the creek's flow into the bank on her side of the creek. She claims that the "constant and continuous" soil erosion caused by the creek's altered flow has washed away three to five feet of the creek bed on her side of the water. That erosion has begun "threaten[ing] the foundation of her home." J.A. 24.

Skidmore sued Norfolk Southern in West Virginia state court in March 2017, initially alleging only state-law claims for negligence, private nuisance, and trespass. In response to the suit, Norfolk Southern obtained the relevant property deeds and conducted a survey of the land on both sides of Loop Creek. The survey and deeds revealed that, in 1903, Norfolk Southern obtained a right of way extending 75 feet from the center of its tracks, across Loop Creek, and over a portion of the land on the other side. A portion of Skidmore's house now sits atop the land over which the right of way runs.[1]

After learning about the right of way, Norfolk Southern amended its answer on March 16, 2018 to include as an affirmative defense that Skidmore lacked standing to pursue her state-law claims because she had no right to exclude Norfolk Southern from the land. In response, Skidmore amended her complaint on August 23, 2018 to include new claims for adverse possession and prescriptive easement (the "quiet title claims"), both of which asserted that she was the exclusive owner of the land at issue by operation of West

---

[1] The history of the land conveyances related to the right of way is somewhat convoluted. Skidmore, however, doesn't dispute that the right of way exists. Nor does she claim that she has always owned the land free and clear or that she's the exclusive owner of the land under a good-faith purchaser theory.

Virginia law.[2] On September 20, 2018—28 days later—Norfolk Southern removed the case to federal court under the theory that the Interstate Commerce Commission Termination Act completely preempts the quiet title claims. *See Lontz v. Tharp*, 413 F.3d 435, 439–40 (4th Cir. 2005) (describing the complete preemption doctrine's jurisdictional implications).

Skidmore moved to remand, arguing that Norfolk Southern's removal was untimely and that the district court lacked subject matter jurisdiction because Skidmore completed her takeover of the land before Congress passed the Termination Act. The district court rejected both arguments.

Skidmore then moved the court to reconsider its jurisdictional ruling because, she argued, the Termination Act doesn't completely preempt her quiet title claims. Shortly thereafter, Norfolk Southern filed a motion for judgment on the pleadings, contending that the Termination Act does, in fact, completely preempt Skidmore's claims and require their dismissal.

The district court resolved both motions in a joint order. It held that Norfolk Southern had an ownership interest in the land at issue and that the Termination Act completely preempts Skidmore's quiet title claims. Based on those conclusions, the court decided that it "lack[ed] subject matter jurisdiction" over the quiet title claims, J.A. 163,

---

[2] The amended complaint also included two other state-law claims that we need not discuss in detail because, for purposes of the jurisdictional questions on appeal, their fate is tied to that of Skidmore's negligence, private nuisance, and trespass claims.

4

that Skidmore "does not own the property she claims eroded," J.A. 164, and that she "lack[ed] standing to pursue" her other state-law claims, *id*.

This appeal followed.

## II.

On appeal, Skidmore renews her arguments that (1) Norfolk Southern's removal was untimely, and (2) the district court lacked jurisdiction over the case (and shouldn't have granted Norfolk Southern's motion for judgment on the pleadings) because the Termination Act doesn't completely preempt her quiet title claims.[3] We begin with the timeliness argument.

## A.

Because the district court's denial of Skidmore's motion to remand was a jurisdictional ruling, we review it de novo. *Elliott v. Am. States Ins. Co.*, 883 F.3d 384, 390 (4th Cir. 2018).

The rules governing removal to federal court provide that a defendant "shall have 30 days after receipt by or service . . . of the initial pleading or summons . . . to file the notice of removal." 28 U.S.C. § 1446(b)(2)(B). If "the case stated by the initial pleading is not removable," however, a defendant may remove the action "within 30 days after receipt . . . of a copy of an amended pleading, motion, order or other paper from which it

---

[3] Skidmore doesn't argue, as she did below, that the district court lacked jurisdiction because she completed her purported takeover of the land before Congress passed the Termination Act. We therefore decline to address that argument.

may first be ascertained that the case is one which is or has become removable." *Id.* at § (b)(3). Under either scenario, a defendant's 30-day removal clock doesn't begin until the basis for removal jurisdiction becomes "apparent within the four corners of the initial pleading or subsequent paper." *Lovern v. Gen. Motors Corp.*, 121 F.3d 160, 162 (4th Cir. 1997); *see also Hurley v. CBS Corp.*, 648 F. App'x 299, 304 (4th Cir. 2016) ("[U]ntil the defendant receives some indicia of removability, the 30-day clock does not begin to run.").

Norfolk Southern contends that its removal was timely because it filed its notice of removal 28 days after Skidmore filed her amended complaint, which plainly stated her quiet title claims for the first time. Skidmore, on the other hand, claims that the 30-day clock should have started when she filed her original complaint or, at the latest, when Norfolk Southern moved to amend its answer to include Skidmore's lack of standing as an affirmative defense. We agree with Norfolk Southern.

While Skidmore alleged in her original complaint that she owned the land at issue, she did so without relying on adverse possession or prescriptive easement theories and without knowledge of Norfolk Southern's right of way. Indeed, Skidmore didn't become aware of Norfolk Southern's possessory interest in the land until the railroad conducted its land survey and reviewed the relevant deeds *after* she filed suit. So Skidmore had no need to include the quiet title claims in her original pleading because, as she understood the facts, she owned the land free and clear of any encumbrances. As a result, there was no quiet title claim apparent in Skidmore's original complaint.

In West Virginia, a plaintiff seeking to adversely possess a right of way granted by deed must show that her possession was "hostile at its inception, adverse, actual, visible,

6

open, notorious, exclusive, under claim of ownership and continuous for [10 years]." *White v. Lambert*, 332 S.E.2d 266, 268 (W. Va. 1985). The elements of a prescriptive easement claim in West Virginia are similar:

> (1) the adverse use of another's land; (2) that the adverse use was continuous and uninterrupted for at least ten years; (3) that the adverse use was actually known to the owner of the land, or so open, notorious and visible that a reasonable owner of the land would have noticed the use; and (4) the reasonably identified starting point, ending point, line, and width of the land that was adversely used, and the manner or purpose for which the land was adversely used.

*Weatherholt v. Weatherholt*, 769 S.E.2d 872, 880 (W. Va. 2015) (cleaned up).

Nothing in the original complaint would have alerted Norfolk Southern that Skidmore was attempting to quiet title of the land under either of those two theories. The complaint contained no allegations about, for example, Skidmore's hostile and uninterrupted use of the land for at least ten years or Norfolk Southern's knowledge of that use. By comparison, her amended complaint makes her quiet title claims crystal clear. Thus, Norfolk Southern's removal clock didn't start when Skidmore filed her original complaint.

Nor did it start when Norfolk Southern amended its answer. The purpose of that amendment was to assert that Skidmore lacked standing to pursue negligence, trespass, and nuisance claims to protect land she didn't own exclusively. We see no reason—and Skidmore provides none—to conclude that Norfolk Southern's amendment was a tacit sign that it anticipated a future quiet title claim.

To the contrary, the quiet title claims didn't become "apparent within the four corners" of any post-complaint "paper" until August 23, 2018, *Lovern*, 121 F.3d at 162,

7

when Skidmore amended her pleading to include them. Norfolk Southern's removal clock began on that date because, until then, it couldn't have ascertained the theory that supported removing the case: that the Termination Act completely preempts the quiet title claims.

In sum, because Norfolk Southern removed the action to federal court on September 20, 2018—within 30 days of August 23—its removal was timely.

B.

We turn next to Skidmore's argument that the Termination Act doesn't completely preempt her quiet title claims. Because the question is one of federal jurisdiction, and because we review it in the context of the district court's rulings on motions to remand and for judgment on the pleadings, we address it de novo. *Elliott*, 883 F.3d at 390 (motions to remand); *Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Beach Mart, Inc.*, 932 F.3d 268, 274 (4th Cir. 2019) (motions for judgment on the pleadings).

Under the "well-pleaded complaint" rule, "state law complaints usually must stay in state court when they assert what appear to be state law claims." *Lontz*, 413 F.3d at 440. The rule holds true even when a defendant raises a question of federal law in defense against a state-law complaint. *Id.* at 439. But the doctrine of complete preemption creates a "narrow exception" to the well-pleaded complaint rule. It provides that "if the subject matter of a putative state law claim has been totally subsumed by federal law—such that state law cannot even treat on the subject matter—then removal is appropriate." *Id.* at 439–40.

We've emphasized, however, that courts must distinguish complete preemption, a "uniquely jurisdictional inquiry," *In re Blackwater Sec. Consulting, LLC*, 460 F.3d 576,

584 (4th Cir. 2006), from ordinary preemption, which operates only as a defense against a claim's merits, *Johnson v. Am. Towers, LLC*, 781 F.3d 693, 702 (4th Cir. 2015) ("Complete preemption and ordinary preemption on the merits 'are not as close kin jurisprudentially as their names suggest.'") (quoting *Lontz*, 413 F.3d at 440).  There are two relevant distinctions between the doctrines.  The first is that, while complete preemption provides defendants a way to remove cases to federal court, ordinary preemption does not.  *Lontz*, 413 F.3d at 441 ("Even if [ordinary] preemption forms the very core of the litigation, it is insufficient for removal.").  The second is that courts may dismiss a state-law claim when ordinary preemption applies, but not when complete preemption applies.  *Darcangelo v. Verizon Commc'ns, Inc.*, 292 F.3d 181, 195 (4th Cir. 2002).

The district court relied on complete preemption to dispose of Skidmore's quiet title claims, so our analysis focuses on that doctrine.

Because the Supreme Court has concluded only three times that a federal statute completely preempts state law (in cases involving the National Bank Act, the Labor Management Relations Act, and the Employee Retirement and Income Security Act), *see Lontz*, 413 F.3d at 441, we apply a presumption against complete preemption, *Id. at* 440.  But that presumption is rebuttable, even in cases involving statutes that the Supreme Court hasn't discussed in the complete preemption context.  *Am. Towers*, 781 F.3d at 701; *see, e.g. Rosciszewski v. Arete Assocs., Inc.*, 1 F.3d 225, 232–33 (4th Cir. 1993) (holding that the Copyright Act completely preempted a plaintiff's Virginia-law claims).

To rebut the presumption against complete preemption, a defendant must demonstrate that "Congress'[s] intent in enacting the federal statute at issue" was to

9

extinguish the state-law claim. *Metro. Life Ins. Co. v. Mass.*, 471 U.S. 724, 738 (1985). This requires a showing that: (1) the preempting statute displays a clear congressional intent to "entirely displace" state law; and (2) the preempting statute creates an exclusive federal cause of action in an area of "overwhelming national interest." *Lontz*, 413 F.3d at 441. We address these requirements in order.

1.

Norfolk Southern contends that the Termination Act—through 49 U.S.C. § 10501(b)—entirely displaces Skidmore's quiet title claims. Section 10501(b)'s first sentence creates the Surface Transportation Board's "exclusive" jurisdiction over

> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State[.]

*Id.*[4] And the Act's second sentence states that "[e]xcept as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." *Id*.

As our sister Circuit noted in *Elam v. Kansas City S. Ry. Co*, the second sentence is "the relevant part of Section 10501(b) for determining the scope of the" Termination Act's complete "preemption of state law." 635 F.3d 796, 805 (5th Cir. 2011) (holding that

---

[4] The Board is an independent federal agency charged with implementing the Termination Act. 49 U.S.C. §§ 1301, 1302; *Friberg v. Kansas City S. Ry. Co.*, 267 F.3d 439, 442 (5th Cir. 2001).

§ 10501(b) completely preempted one of the plaintiff's state-law claims). As we explain, despite the presumption against complete preemption, § 10501(b)'s second sentence is powerful enough to "entirely displace" Skidmore's quiet title claims. *Lontz*, 413 F.3d at 441.

a.

We've held that Congress intended § 10501(b) "to displace" (and therefore preempt) "'regulation,' i.e., those state laws that may reasonably be said to have the effect of 'managing' or 'governing' rail transportation." *PCS Phosphate Co. v. Norfolk S. Corp.*, 559 F.3d 212, 218 (4th Cir. 2009). Conversely, § 10501(b) permits the "continued application of [state] laws having a more remote or incidental effect on rail transportation." *Id.*[5] In a recent decision, we determined that § 10501(b)'s preemption language extends not only to "statutes and ordinances," but also to "common-law tort actions." *Edwards v. CSX Transportation, Inc.*, 983 F.3d 112, 121 (4th Cir. 2020). Section 10501(b) therefore

---

[5] *PCS Phosphate* dealt with ordinary preemption, not complete preemption. *See* 559 F.3d at 216 (stating that the plaintiff filed the case in federal court). Nonetheless, we may rely on ordinary preemption cases to inform our analysis here. *Rosciszewski*, 1 F.3d at 229–33 (finding that a state-law claim was preempted, and then discussing in the next section whether the court had removal jurisdiction based on that preemption); *see also Elam*, 635 F.3d at 805 (discussing complete preemption while relying on *Franks Inv. Co. LLC v. Union Pac. R. Co.*, 593 F.3d 404, 407–08 (5th Cir. 2010), an ordinary preemption case); *Smart v. Loc. 702 Int'l Bhd. of Elec. Workers*, 562 F.3d 798, 804 (7th Cir. 2009) ("A logical first step in [the complete preemption] analysis is determining whether the state claim is displaced by federal law under an ordinary preemption analysis.") (cleaned up). Thus, drawing on our ordinary preemption case law doesn't cross the analytical line between complete and ordinary preemption, *see Lontz,* 413 F.3d at 440, particularly when both preemption analyses require us to determine whether federal law "displaces" state law, *id.* at 441.

reflects Congress's intent to displace any state-law claims—including those like Skidmore's—that effectively govern or manage rail transportation.

To ascertain whether a claim falls within § 10501(b)'s preemption provision, "courts rely" on "[t]he [Surface Transportation Board's] interpretation of the provision." *PCS Phosphate*, 559 F.3d at 218. And the Board has unequivocally held that attempts to adversely possess a railroad's property constitute efforts to govern or manage rail transportation.

First, in *Jie Ao & Xin Zhou – Pet. For Declaratory Ord.*, the Board considered a claim that two petitioners had adversely possessed land over which a railroad had a right of way. FD 35539, 2012 WL 2047726, at *2 (S.T.B. June 4, 2012). Even though the railroad wasn't currently using the land, the Board concluded that "the application of adverse possession to [the land at issue] would amount to regulation of rail transportation because it would confer exclusive control to the Petitioners over property that is part of the national rail network." *Id.* at *3. That exclusive control, the Board reasoned, would "prevent entry onto the property for rail-related maintenance and stabilization/sloping repair activities." *Id.* at *6.

The Board also made clear that the § 10501(b) preemption analysis has little to do with whether the railroad is currently using its right of way:

> [A]ssuming arguendo, that [the petitioners are] correct that the application of state adverse possession law here might have little actual, practical effect on current plans for active railroad operations, *circumstances can change*. [The petitioners'] approach to preemption would permit landowners to carve off strips of railroad [rights of way] all over the country for non-rail use, even though the Board has not authorized the [rights of way] to be permanently removed from the nation's rail system under Title 49. That untenable result

12

would undermine interstate commerce and the strong federal policy in favor of retaining rail property in the national rail network, where possible.

*Id.* at \*7 (emphasis added); *see also Chessie Logistics Co. v. Krinos Holdings, Inc.,* 867 F.3d 852, 859 (7th Cir. 2017) ("As the Surface Transportation Board's decision in *Jie Ao* shows, federal law preempts state-law efforts against railroads to treat railroad rights-of-way as abandoned or lost through adverse possession.").

Two years later, in a case involving a trucking company's attempt to adversely possess a small, dormant portion of an active railyard, the Board reiterated that § 10501(b) preempts any "application of state law claims that would take rail property for another, conflicting use, including adverse possession claims that would interfere with rail use, *present or future.*" *14500 Ltd. LLC – Pet. for Declaratory Ord.*, FD 35788, 2014 WL 2608812, at \*4 (S.T.B. June 4, 2014) (emphasis added).

With these cases in mind, we turn to the parties' contentions. Norfolk Southern argues that Skidmore's quiet title claims (if successful) would remove the land at issue from the national railway system and deprive Norfolk Southern of the ability to use the land to support its rail transportation operations. Skidmore responds that her claims can't effectively govern or manage Norfolk Southern's rail transportation operations because Norfolk Southern has never utilized the land on her side of Loop Creek, and has no immediate plans to do so. Of course, Norfolk Southern contends that it does, in fact, utilize the land by draining its surface water into Loop Creek and the abutting creek bed. But even if Skidmore is correct, the fact that Norfolk Southern may use the land in the future

13

is enough to hold that her claims constitute an attempt to govern or manage rail transportation.

Skidmore spills much ink arguing that the Termination Act can't completely preempt her quiet title claims because the Act doesn't preempt (1) "all state law causes of action," Appellant's Br. at 16–22, or (2) all "state-law quiet title" claims, Reply Br. at 3–8. Those general statements may be true, but they miss the point. Norfolk Southern doesn't need to show that § 10501(b) displaces all state law claims brought against railways or all quiet title actions in every context. Rather, it must establish only that the Termination Act displaces Skidmore's particular claims because, in this particular case, they effectively regulate rail transportation when brought against railroads like Norfolk Southern.

Skidmore also seizes on *Jie Ao*'s separate treatment of the petitioners' adverse possession and prescriptive easement claims to argue that her prescriptive easement claim should proceed in state court, even if § 10501(b) completely preempts her adverse possession claim. And it's true that the Board determined that state courts can and should address prescriptive easement claims like the one the *Jie Ao* petitioners brought. 2012 WL 2047726, at *7–*8. But, importantly, the *Jie Ao* petitioners' prescriptive easement claim wouldn't have deprived the railroad of its right of way—instead, the petitioners sought a "prescriptive *nonexclusive* easement." *Id.* at *7 (emphasis added).

According to the Board, easements that don't "take railroad property outright" don't necessarily "affect the rail network in the same way as carving out property that is part of a railroad." *Id.* Since such easements may still "allow the railroad to access the property," the Board determined that the railroad could still use the land for rail transportation and

14

state courts could apply state law to determine the scope of the nonexclusive easement at issue. *Id.*

In *14500 Ltd. LLC*, however, the Board distinguished nonexclusive prescriptive easement claims from those that "seek[] to exclude [the railroad] from the property." 2014 WL 2608812, at *5. Because *14500 Ltd. LLC* involved a claim for an easement that would exclude the railroad from the land, the Board determined that the district court in that case "correctly concluded that the exclusive easement claim has the same effect as the adverse possession claim and is preempted by § 10501(b)." *Id.*

Here, Skidmore's claim for prescriptive easement is, for all intents and purposes, the same as her claim for adverse possession because, through it, she hopes to exclude Norfolk Southern from the land on her side of Loop Creek. Her amended complaint seeks to "quiet title" in her favor through prescriptive easement so that she can use the land "in a manner consistent with normal and customary use of residential real estate." J.A. 27–28, 30. Nowhere in her pleadings or briefs does she suggest that the claim is limited to the nonexclusive ownership of the land at issue. And that makes sense, for such relief wouldn't accomplish her goal of preventing Norfolk Southern from also using Loop Creek and its creek beds for drainage purposes.

Since both of Skidmore's quiet title claims operate to exclude Norfolk Southern from the land at issue, their analysis with respect to § 10501(b) merges. And since both have the effect of managing or governing rail transportation, they're the type of state-law claim that § 10501(b) displaces. *Edwards*, 983 F.3d at 121.

15

b.

Skidmore also argues that her claims don't effectively manage or govern rail transportation because the way that Norfolk Southern wishes to use the land doesn't qualify as "rail transportation" within § 10501(b)'s meaning. But it's difficult to imagine how a party could exclude a railroad company from land that it uses for track drainage without effectively governing how the railroad conducts its transportation operations. Indeed, ensuring proper surface-water drainage from a railroad's tracks is so vital to railroad maintenance that federal law requires all railroad tracks to be "supported by material which will . . . [p]rovide adequate drainage for the track." 49 C.F.R. § 213.103.

The Termination Act's text supports our conclusion. The Act defines "transportation," in the context of railroads, to include a "facility . . . or equipment of any kind related to the movement of passengers or property, or both, by rail." 49 U.S.C. § 10102(9)(A). Since the Act doesn't further define "facility" or "equipment," we must give the words their ordinary meaning. *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). In this context, a railroad's "facilities" describe the "physical means or equipment required for doing something." *Facility*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/view/Entry/67465?redirectedFrom=facility#eid (last visited May 27, 2021). Similarly, the term "equipment" means "all the fixed assets other than land and buildings of a business enterprise." *Equipment*, MERRIAM-WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/equipment (last visited May 27, 2021).

If § 10501(b) displaces all state-law claims that effectively manage or govern rail "transportation," then it displaces claims that effectively manage or govern: (1) the physical

16

means required for operating a railroad and (2) a railroad's fixed assets other than land or buildings. Using those definitions, railroad tracks undoubtedly qualify as "facilities" and "equipment," so they also qualify as "rail transportation" under the Termination Act. And the goal of Skidmore's lawsuit is to exclude Norfolk Southern from her side of Loop Creek so that she can dictate how Norfolk Southern drains surface water from those tracks. In essence, she desires to use state law to manage or govern how the railroad conducts its rail transportation operations—a result that the Termination Act can't abide.

Congress plainly intended, through § 10501(b), to preempt state-law claims that have the effect of regulating rail transportation. Skidmore's quiet title claims are such claims.

2.

We next consider whether the Termination Act creates an exclusive federal cause of action in an area of "overwhelming national interest." *Lontz*, 413 F.3d at 441. We conclude that it does.

a.

The Act states that "[a] rail carrier providing transportation subject to the jurisdiction of the [Surface Transportation Board] under this part is liable for damages sustained by a person as a result of an act or omission of that carrier in violation of this part." 49 U.S.C. § 11704(b). Section 11704 also provides that "[a] person may file a complaint with the Board under section 11701(b) of this title or bring a civil action under subsection (b) of this section to enforce liability against a rail carrier providing

17

transportation subject to the jurisdiction of the Board under this part." 49 U.S.C. § 11704(c).

Three other circuits have construed these provisions to "contemplate[] civil actions against rail carriers" filed directly in federal court. *Elam*, 635 F.3d at 809 (Fifth Circuit); *Pejepscot Indus. Park, Inc. v. Maine Cent. R. Co.*, 215 F.3d 195, 204–05 (1st Cir. 2000); *Consol. Rail Corp. v. Grand Trunk W. R. Co.*, 607 F. App'x 484, 491 (6th Cir. 2015). And in a recent unpublished opinion, we agreed. *See Norfolk S. Ry. Co. v. Baltimore & Annapolis R.R.*, 715 F. App'x 244, 248–49 (4th Cir. 2017) (concluding that federal courts and the Board have concurrent original jurisdiction over disputes under the Termination Act). We now reaffirm that the Termination Act creates a cause of action that plaintiffs can pursue directly in federal court.

To be sure, Skidmore's claims ask the court to quiet title to the land in her favor, whereas the Termination Act appears to contemplate only damages awards and judicial enforcement of Surface Transportation Board orders. 49 U.S.C. § 11704(a)–(c). But the Supreme Court has held that complete preemption requires only that the preempting federal statute provide a *cause of action* that preempts state law, not that the statute provide *remedies* like those available under state law. *Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists & Aerospace Workers*, 390 U.S. 557, 561 (1968) ("The nature of the relief available after jurisdiction attaches is, of course, different from the question whether there is jurisdiction to adjudicate the controversy."); *Caterpillar Inc. v. Williams*, 482 U.S. 386, 391 n.4 (1987) (reiterating that state-law claims may be removable through complete preemption even though the preempting statute doesn't provide remedies available under

18

state law); *see also Singh v. Prudential Health Care Plan, Inc.*, 335 F.3d 278, 292 (4th Cir. 2003) (ruling that, when a claim is completely preempted, "the district court must consider only remedies authorized by [the preempting federal statute] and must reject all others.").

That's what we have here. Although the Termination Act makes no adverse-possession-like remedy available to plaintiffs, the Act nonetheless affords plaintiffs a federal cause of action. And, by its terms, the Act makes that cause of action the "exclusive" avenue for obtaining judicial relief by "preempt[ing] the remedies provided under . . . State law." 49 U.S.C. § 10501(b). Since we've also held that § 10501(b)'s language's "preemptive effects" make the federal cause of action the exclusive avenue for plaintiffs seeking relief, *Edwards*, 983 F.3d at 121, Norfolk Southern has satisfied this step of the analysis.

b.

Finally, in the context of this case, Skidmore's quiet title claims qualify as "claims of overwhelming national interest." *Lontz*, 413 F.3d at 441. Like the national banking system that the Supreme Court discussed in *Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 2 (2003), the web of interstate rail lines that connects our country's far-flung cities is a "subject of unique national concern." *Lontz*, 413 F.3d at 441 (discussing *Anderson*). Broadly speaking, Congress recognized "long ago" that "a uniform regulatory scheme is necessary to the operation of the national rail system." *United Transp. Union v. Long Island R. R. Co.*, 455 U.S. 678, 688 (1982). And the Supreme Court has long viewed the national rail system as a "most important national industry," *Bhd. of R.R. Trainmen v. Chi.*

19

*River & Ind. R.R. Co.*, 353 U.S. 30, 40 (1957), that's become "essential to the national economy," *United Transp. Union*, 455 U.S. at 688.

More specifically, Congress has codified our "national policy to preserve established railroad rights-of-way for future reactivation of rail service [and] to protect rail transportation corridors." 16 U.S.C. § 1247(d). That very policy animated the Surface Transportation Board's conclusion in *Jie Ao* that the Termination Act preempted the petitioners' adverse possession claim. 2012 WL 2047726, at \*7 (holding that permitting "landowners to carve off strips of railroad [rights of way] all over the country for non-rail use" without the Board's authorization would be an "untenable result" that "would undermine interstate commerce and the strong federal policy in favor of retaining rail property in the national rail network.").

Indeed, allowing an individual landowner to wrest exclusive control of land within the national rail corridor away from a railroad could expose a rail carrier to death by a thousand cuts. Rail carriers would either have to be hyper-vigilant about fending off adverse possession claims along countless miles of tracks, or risk losing ownership interests in land that is (or might be) necessary to conduct business and comply with federal regulations. Because maintaining a unified federal mechanism for governing the national rail network is an issue of overwhelming national importance, federal law must preempt Skidmore's quiet title claims.

*     *     *

In sum, the Termination Act's exclusive cause of action demonstrates Congress's clear intent to "entirely displace" attempts to use state-law adverse possession or

prescriptive easement claims to dispossess a railroad of land over which it has a right of way. That intent reflects the primacy that Congress places on maintaining the national railway network. We therefore affirm the district court's conclusion that the Termination Act completely preempts Skidmore's quiet title claims.

### III.

At this point, however, we part ways with the district court's analysis. In its joint order resolving the parties' motions, the court first denied Skidmore's motion to remand because the Termination Act's complete preemption of Skidmore's quiet title claims created federal removal jurisdiction. Then, after turning its attention to Norfolk Southern's motion for judgment on the pleadings, the court dismissed the quiet title claims because they were "completely preempted by the [Termination Act] and, thus," the court "lack[ed] subject matter jurisdiction over" them. J.A. 163.

Those two rulings are incompatible, and the latter runs contrary to the complete preemption doctrine's purpose. As explained above, a court's conclusion that complete preemption applies means that the court *has* jurisdiction over ostensibly state-law claims, not that it *lacks* jurisdiction over them. *Lontz*, 413 F.3d at 439–40. The district court's decision to dismiss Skidmore's quiet title claims for lack of jurisdiction based on complete preemption was therefore error. *Darcangelo*, 292 F.3d at 195 ("[W]hen a claim under state law is completely preempted and is removed to federal court because it falls within the scope of [the preempting statute], the federal court should not dismiss the claim as preempted . . . .").

21

Since the district court had jurisdiction over Skidmore's claims, the question then becomes how it should have resolved them. In this circuit, when a court finds that a federal statute completely preempts a state-law claim, complete preemption "transforms the plaintiff's state-law claims into federal claims," meaning that, effectively, there's "no such thing as the state action." *Lontz*, 413 F.3d at 441 (cleaned up). In other words, the district court must "convert" the state-law claims "into federal claims that need to be decided as federal claims under" the preempting statute. *Singh*, 335 F.3d at 292; *see also Rosciszewski,* 1 F.3d at 234 (holding that removal was proper based on complete preemption before concluding that the district court properly dismissed claims based on res judicata).

On remand, then, the district court must convert Skidmore's quiet title claims into claims under the Termination Act and analyze them using the Federal Rule of Civil Procedure 12(c) standard that governs Norfolk Southern's motion for judgment on the pleadings. The court may, if it chooses, permit Skidmore to amend her complaint to clarify the scope of her Termination Act claims before revisiting Norfolk Southern's motion. *See Singh*, 335 F.3d at 292. But "[r]egardless of how [Skidmore's] claims are ultimately pleaded, the remedies available to" her with respect to her preempted claims "are limited to those remedies set forth in" the Termination Act. *Id.* Additionally, because it appears that the district court (at least in part) based its decision to dismiss Skidmore's "unreasonable use, private nuisance, trespass, strict liability, and negligence" claims on its complete preemption ruling, *see* J.A. 163, the court should also reexamine those claims.

22

IV.

For these reasons, we affirm the district court's ruling on Skidmore's motion to remand, vacate the court's ruling on Norfolk Southern's motion for judgment on the pleadings, and remand for further proceedings consistent with this opinion.

*AFFIRMED IN PART, VACATED IN PART, AND REMANDED*