**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-1782

JIMMY EDWARDS; ROBERT HUNT; DOLORES HUNT; CLIFFORD MCKELLAR, JR.; EMMA MCKELLAR; ANTOINETTE MOORE; WEST LUMBERTON BAPTIST CHURCH; CURRIE CHAIN SAW, INCORPORATED; C.J.M. VENTURES, INCORPORATED; WILLIAM LOCKLEAR, d/b/a Stricklands's Barbershop; TBL ENVIRONMENTAL LABORATORY, INCORPORATED; SAMMY'S AUTO SALES, INCORPORATED; LINDA SAMPSON; ERIC CHAVIS, on behalf of themselves and all others similarly situated,

Plaintiffs - Appellants,

v.

CSX TRANSPORTATION, INCORPORATED,

Defendant - Appellee.

Appeal from the United States District Court for the Eastern District of North Carolina, at Wilmington. Terrence W. Boyle, Chief District Judge. (7:18-cv-00169-BO; 7:18-cv-00177-BO; 7:18-cv-00178-BO)

Argued: October 26, 2020                    Decided: December 15, 2020

Before WYNN, HARRIS, and QUATTLEBAUM, Circuit Judges.

Affirmed in part, reversed in part, and remanded by published opinion. Judge Wynn wrote the opinion, in which Judge Harris and Judge Quattlebaum joined.

**ARGUED:** William Franklin Cash, III, LEVIN PAPANTONIO THOMAS MITCHELL RAFFERTY & PROCTOR, P.A., Pensacola, Florida, for Appellants. April N. Ross, CROWELL & MORING LLP, Washington, D.C., for Appellee. **ON BRIEF:** Theodore J. Leopold, Martha Geer, Adam Langino, COHEN MILSTEIN SELLERS & TOLL PLLC, Raleigh, North Carolina; Daniel K. Bryson, Matthew E. Lee, Jeremy R. Williams, WHITFIELD BRYSON & MASON LLP, Raleigh, North Carolina; Gregory F. Coleman, GREG COLEMAN LAW PC, Knoxville, Tennessee; Mark R. Sigmon, SIGMON LAW, PLLC, Raleigh, North Carolina, for Appellants. Henry L. Kitchin, Jr., MCGUIREWOODS LLP, Wilmington, North Carolina; Scott L. Winkelman, Amanda Shafer Berman, Rachel P. Raphael, CROWELL & MORING LLP, Washington, D.C., for Appellee.

---

WYNN, Circuit Judge:

In this putative class action, residents and businesses of Lumberton, North Carolina allege that CSX Transportation caused their property to be flooded during Hurricanes Matthew and Florence. The district court dismissed each of their claims as either insufficiently pleaded or preempted by federal law. We largely agree with that determination. But for the reasons that follow, we conclude that dismissal of one claim— for breach of contract—was premature. Accordingly, we affirm in part, reverse in part, and remand for further proceedings.

I.

A.

Lumberton straddles the Lumber River, which flows from northwest to southeast.[1] The north side of town, on one side of the river, is on somewhat elevated terrain. But the neighborhoods on the south and west sides are low-lying areas that are prone to flooding. So, in the 1960s, a group of local, state, and federal authorities came together to build a levee system. An earthen barrier would run along the river's southwestern bank before merging in a "T" shape with an elevated segment of I-95. Construction began in 1975 and concluded two years later.

As devised, the levee system contains a glaring vulnerability: since the 1850s, CSX and its forebearers have operated a rail line that parallels the river south of the earthen

---

[1] The facts here are drawn from the operative complaint.

barrier. I-95 crosses over the rail line and an adjacent road via an overpass, creating an unobstructed "gap" through which trains—and waters—may run.[2] According to Plaintiffs, the gap is low and wide enough "to act as a drain or funnel" during heavy storms, "pulling" floodwaters into southwest Lumberton and rendering the levee system ineffective. J.A. 6.[3]

To address this problem, the City of Lumberton entered into a licensing agreement in 1978 with Seaboard Coast Line Railroad Company (CSX's predecessor) and Robeson County Drainage District No. 1. Pursuant to that "Tri-Party Agreement," the City and the Drainage District are permitted "to construct and maintain portions of a[n] . . . earthen dike on the easterly and westerly portions of [the railroad's] right of way" through the gap.[4] *Id.* at 56. Further, the City may "clos[e] said dike across [the railroad's] track" whenever Lumberton "is in [im]minent danger of flood[ing]," so long as it gives "at least 12 hours['] notice prior to such closing." *Id.* at 57.

In 1979, the City published a set of Operational Procedures, affirming its intent to "provid[e] flood protection to South and West Lumberton" by sandbagging the gap during major weather events. *See id.* at 63. It is unclear how frequently, if ever, the City effectively exercised that protocol in the decades that followed.

---

[2] We have appended a map depicting the river, I-95, the rail line, and the earthen barrier to the end of this opinion.

[3] Citations to "J.A. __" refer to the Joint Appendix filed by the parties in this appeal.

[4] A copy of the Tri-Party Agreement was submitted with the operative complaint, and CSX does not dispute its authenticity.

However, on October 8, 2016, the City notified CSX that it "sought to construct an emergency sandbag dam" at the gap in response to Hurricane Matthew, which had just made landfall and threatened to bring severe flooding. *Id.* at 17. But CSX refused to allow access to its right-of-way. Predictably, the Lumber River coursed through the gap. The resulting damage was catastrophic.[5]

Then, in September 2018, Hurricane Florence threatened to cause major flooding in the area. As before, the City invoked its right to close the gap. CSX initially rebuffed the request, but it complied after the Governor issued an emergency order. At that point, however, there was only time to hastily construct a makeshift berm, which ultimately failed. South and West Lumberton flooded for the second time in as many years.

### B.

Plaintiffs initiated three putative class actions against CSX in the fall of 2018.[6] The district court consolidated their cases in January 2019. At bottom, they allege that CSX breached its obligations under the Tri-Party Agreement, unduly prevented the City from closing the gap, and failed to take other necessary steps to prevent flooding. They assert four causes of action—one in contract, three in tort—and seek both monetary damages for

---

[5] According to Plaintiffs, flooding from Matthew in Lumberton "resulted in more than 1,500 people being displaced for months, 2,367 structures being damaged, and $257,574,000 in damage." J.A. 18.

[6] Plaintiffs presently seek certification of two classes: (1) an "Area Residents Class," defined as "[a]ll persons whose real or personal property located in Lumberton . . . was damaged or destroyed due to floods through the gap"; and (2) an "Area Business Class," which includes "[a]ll businesses in Lumberton . . . that lost income or suffered damage to real or personal property due to floods through the gap." *Id.* at 36.

flood-related losses and an injunction requiring CSX "to no longer pose a threat to Plaintiffs or the class." *Id*. at 41–51.

On CSX's 12(b)(6) motion, the district court dismissed all four claims. As to the contract claim, the court concluded that Plaintiffs had failed to plausibly allege that they are intended third-party beneficiaries of the Tri-Party Agreement between the railroad, the City, and the Drainage District, and, accordingly, that they lack the power to enforce any alleged breach. And as to the tort claims, the court found that each was preempted by a federal railroad statute—the Interstate Commerce Commission Termination Act. Plaintiffs timely appealed.

## II.

We review the district court's dismissal under Rule 12(b)(6) de novo, accepting all factual allegations in the operative complaint as true and drawing all reasonable inferences in Plaintiffs' favor. *Dawson-Murdock v. Nat'l Counseling Grp., Inc.*, 931 F.3d 269, 274–75 (4th Cir. 2019). The same standard of review applies when determining whether a common-law cause of action is preempted by a federal statute. *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 191 (4th Cir. 2007).

## III.

We begin with Plaintiffs' contract claim. In North Carolina, a third party can sue for breach of a contract if he can show that: (1) the contract exists; (2) the contract is valid and enforceable; and (3) the contracting parties "intended primarily and directly to benefit him or the class of persons to which he belongs." *DeMent v. Nationwide Mut. Ins. Co.*, 544 S.E.2d 797, 801 (N.C. Ct. App. 2001); *see Holshouser v. Shaner Hotel Grp. Props. One*

6

*Ltd. P'ship*, 518 S.E.2d 17, 25 (N.C. Ct. App. 1999), *aff'd*, 524 S.E.2d 568 (N.C. 2000).

CSX does not dispute that the first two elements are satisfied as to the Tri-Party Agreement. But the third element—intent to benefit—is key here, because merely incidental beneficiaries may not maintain an action on a contract. *See Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 407 S.E.2d 178, 181–182 (N.C. 1991); 13 Williston on Contracts § 37:8 (4th ed. 2013 & Supp. 2020).

To determine the contracting parties' intent in this context, we "consider [both the] circumstances surrounding the transaction as well as the actual language of the contract." *Raritan*, 407 S.E.2d at 182. That means looking outside the "four corners" of the contract when necessary, even as we ultimately construe the agreement strictly against the third party seeking enforcement. *Id.*; *see Sys. Craft, Inc. v. British-Am. Ins. Co.*, No. 87-1627, 1987 WL 24472, at *2 (4th Cir. Dec. 2, 1987) (per curiam) ("North Carolina courts do not apply the parol evidence rule with great strictness in cases involving third party beneficiaries.").

As explained above, the Tri-Party Agreement clearly authorizes the City to barricade the gap when the risk of flooding is high.[7] What is somewhat less clear is whether Plaintiffs have plausibly alleged that they are direct, intended beneficiaries entitled to

---

[7] CSX argues that the City's authority to close the gap is contingent upon it first constructing an earthen dike on each side of the rail line, which it has not yet done. They also raised this argument below. But because the district court concluded that Plaintiffs had no power to enforce the Tri-Party Agreement, it never addressed whether the City had failed to fulfill this alleged prerequisite. We decline to address this question in the first instance. However, CSX is free to pursue the argument on remand.

enforce that agreement. The district court did not think so, noting that the contract itself makes no mention of Plaintiffs or the proposed class, of any specific neighborhoods of Lumberton, or even of the public at large.

Yet the operative complaint alleges facts related to the "circumstances surrounding the transaction" which, fairly viewed, indicate that the contracting parties intended to benefit a defined group of Lumbertonians—those living and working in the south and west sides of the city. Though it is perhaps a close call, we think these allegations plausibly support Plaintiffs' claim to third-party-beneficiary status at this early stage of the litigation.

Plaintiffs specifically allege that "[t]he north side of Lumberton, where downtown is, is elevated somewhat and is thus relatively safe from the Lumber River," whereas "*the south and west sides*, where Plaintiffs are located, are lower-lying ground, and more vulnerable to floods." J.A. 10 (emphasis added). They further allege that governmental entities teamed up in the 1960s "to plan for a levee system that would protect *the south and west sides* of Lumberton," *id.* (emphasis added), and that although the system was completed in 1977, the gap still remained, *id.* at 11. The City, the Drainage District, and Seaboard then entered into the Tri-Party Agreement to "deal with the inevitability of flooding at the gap." *Id.* at 11–12. And a year later, the City noted in its Operational Procedures that its specific aim in securing a right to sandbag the gap was to "provid[e] flood protection to *South and West Lumberton*." *See id.* at 13, 63 (emphasis added).

Taken together, and with all reasonable inferences drawn in Plaintiffs' favor, those allegations plausibly support the notion that the Tri-Party Agreement was "made for the direct benefit of the people of Lumberton whose homes and businesses would be damaged

8

by floods if the CSX gap were not closed." J.A. 41. That is enough to survive 12(b)(6) dismissal. *Cf. Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 709 (4th Cir. 2007) ("[T]he inquiry into third-party beneficiary status is fact sensitive and not ordinarily ripe for resolution at the motion-to-dismiss stage.").

In reaching the opposite conclusion, the district court relied on two North Carolina cases that warrant discussion here. The first is *Matternes v. City of Winston-Salem*, in which the Supreme Court of North Carolina considered whether an injured driver could sue a municipality for breaching its contract with the state to maintain certain roadways. *See* 209 S.E.2d 481, 487–89 (N.C. 1974). There, the court embraced the general rule that ordinary citizens may not sue to enforce municipal contracts, even if they get some incidental benefit from their performance. *Id.* at 488–89. Because "every city contract . . . is for the benefit of the public," a hopeful third-party beneficiary must demonstrate something more: that the contracting parties intended to confer a "primary and immediate" benefit directly upon the specific class to which he belongs. *Id.* at 488 (quoting *H.R. Moch Co. v. Rensselaer Water Co.*, 159 N.E. 896, 897 (N.Y. 1928) (Cardozo, J.)). Evidence of that intent was lacking in *Matternes*; whatever incidental benefit the driver may have derived from proper upkeep of the highway, it was obvious under the circumstances "that the only beneficiaries contemplated were the parties to the contract themselves." *Id.* at 489.

The second case is *Hospira Inc. v. Alphagary Corp.*, where the North Carolina Court of Appeals considered a manufacturer's third-party-beneficiary claim against one of its contractors' suppliers. 671 S.E.2d 7, 13 (N.C. Ct. App. 2009). The manufacturer was not expressly mentioned in the contract at issue. *Id.* But it offered some evidence suggesting

9

that it had helped to coordinate the agreement between the contractor and the supplier, and that the parties understood that it planned to use the product at the center of their contract in its manufacturing. *Id.* Reviewing an order granting summary judgment—not a 12(b)(6) dismissal like we have here—the court found this evidence insufficient to establish third-party-beneficiary status; although the manufacturer may have played some role in orchestrating the contract, its involvement was not "active and direct" enough to prove that the contract was entered into primarily for its benefit. *Id.*

Both cases—*Matternes* and *Hospira*—boil down to intent. Citizens cannot ordinarily sue for breach of a city contract; but if it's clear that the parties intended to benefit them specifically and directly, they can. A lack of evidence of "active and direct dealings" might ultimately sink a third-party-beneficiary claim; but that's not to say such evidence is required at the Rule 12(b)(6) stage if the complaint's allegations, and all reasonable inferences therefrom, accepted as true, plausibly state an intent to benefit the third party. We conclude that Plaintiffs have pleaded facts sufficient to make that showing for purposes of surviving 12(b)(6) dismissal.

But our holding is limited. In addition to the Tri-Party Agreement, Plaintiffs allege the existence of a second, unnamed and undated agreement, pursuant to which CSX's predecessor "agreed to construction of a permanent floodgate at the gap." *See* J.A. 13–14. Plaintiffs have neither produced this supposed secondary agreement, nor pleaded any of its essential terms. Instead, they lean on a 2017 state-commissioned report, which mentions in passing that "[a]greements were reached between all parties" to make "permanent improvements" at the gap. J.A. 14 (alteration in original) (quoting N.C. Div. of Emergency

10

Mgmt., *Hurricane Matthew: Sources of Flooding and Mitigation Strategies in Lumberton, NC* 4 (Sept. 2017) ("Report")).[8] However, it is unclear from that report who the "parties" are, whether the "agreements" they reached are valid and enforceable, or whether a floodgate was even envisioned as part of the "permanent improvements" alluded to therein.[9] In short, Plaintiffs have not plausibly alleged that CSX's predecessor agreed to install a permanent floodgate at the gap. And without an agreement to enforce, the question of third-party-beneficiary status is irrelevant. *See Holshouser*, 518 S.E.2d at 25 (plaintiff seeking to enforce contract as third-party beneficiary must first show "that a contract exists" which "is valid and enforceable"). Thus, while we conclude that Plaintiffs may advance their breach-of-contract claim, they may only do so with respect to the Tri-Party Agreement.

IV.

We also must consider whether Plaintiffs' tort claims are preempted by the federal Interstate Commerce Commission Termination Act ("the Act"). Because we conclude that they are, we affirm the district court's dismissal of those claims.

---

[8] The report is available at https://connect.ncdot.gov/resources/BUILD2019-I95/Documents/171024_Lumberton%20Mitigation%20Strategies.pdf.

[9] The report only mentions two specific "permanent improvements": raising the road adjacent to CSX's track by approximately two feet and constructing an earthen dike in the area between the road and the rail line. Report at 3–4.

Though captioned somewhat differently,[10] all three of Plaintiffs' tort claims fault CSX for more or less the same conduct: (1) refusing to permit temporary closure of the gap in advance of Hurricanes Matthew and Florence; (2) failing to install a floodgate (or similar permanent fix); and/or (3) using "more porous" materials to rebuild portions of its track bed that had been washed away during Hurricane Matthew, which worsened the risk of flooding. *See* J.A. 43–50. In essence, Plaintiffs contend that CSX should have operated, maintained, and constructed its rail line through the gap differently. But, as explained below, the Act assigns exclusive regulatory authority over such matters to the Surface Transportation Board. As such, we agree with the district court that Plaintiffs' tort claims "squarely implicate questions . . . that Congress has reserved for the [Surface Transportation Board]" and are, therefore, expressly preempted. *Id.* at 243.

"Congress may preempt state common law as well as state statutory law through federal legislation." *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005). The Act does just that. *See Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 157–58 (4th Cir. 2010). In relevant part, the Act provides:

The jurisdiction of the [Surface Transportation] Board over—

> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

---

[10] The tort claims are styled as follows: "Count 2: Tort Cause of Action Based on a Railroad Corporation's Duty to Protect the Public Good"; "Count 3: Negligence and Willful and Wanton Misconduct"; and "Count 4: Trespass and Nuisance Arising from CSX's Intentional Diversion of the Flow of Surface Waters." J.A. 43–50. But the substantive differences between them are few.

12

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

*is exclusive*. Except as otherwise provided in this part, *the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law*.

49 U.S.C. § 10501(b) (emphases added).

We have previously recognized that the provisions cited above produce both express and implied preemptive effects. *See PCS Phosphate Co., Inc. v. Norfolk S. Corp.*, 559 F.3d 212, 217–22 (4th Cir. 2009). With respect to express preemption, Congress "narrowly tailored the [Act] . . . to displace only 'regulation,'"—that is, those laws and actions "that may reasonably be said to have the effect of 'managing' or 'governing' rail transportation."[11] *Id.* at 218 (quoting *Fla. E. Coast Ry. Co. v. City of W. Palm Beach*, 266 F.3d 1324, 1331 (11th Cir. 2001)). Consequently, "those state or local laws that have a more remote or incidental impact on rail transportation"—think laws of general

---

[11] As we have previously held, voluntary agreements are not "the sort of rail 'regulation' contemplated by the [Act]." *PCS Phosphate*, 559 F.3d at 214; *see also id.* at 218–19. Accordingly, Plaintiffs' contract claim is not expressly preempted. And although that claim might still be impliedly preempted, CSX has not made that argument here. We decline to address such a fact-specific issue in the first instance without the benefit of briefing. *See id.* at 221 (concluding that the contract at issue in *PCS Phosphate* was not impliedly preempted, but noting that "[t]his is not to say that a voluntary agreement could never constitute an 'unreasonable interference' with rail transportation"); *CSX Transp., Inc. v. City of Sebree*, 924 F.3d 276, 287 (6th Cir. 2019) (concluding that a particular voluntary agreement would "unreasonably interfere" with a railroad's operations by "forcing it to utilize a maintenance method that is no longer safe").

applicability, like local fire or plumbing codes—are not expressly preempted. *Norfolk S. Ry. Co.*, 608 F.3d at 158; *see also In re CSX Trans. Inc.—Pet. for Declaratory Order*, FD 35832, 2016 WL 787578, at *3 (S.T.B. Feb. 24, 2016) ("*Holly Acres II*") ("[S]tate or local action is categorically, or *per se*, preempted under § 10501(b) [only] if it intrudes upon matters that are directly regulated by the [Surface Transportation Board]."). Nevertheless, state laws and actions may be *impliedly* preempted if, in application, they have the effect of "unreasonably interfer[ing]" with railroad transportation.[12] *PCS Phosphate*, 559 F.3d at 220–21.

Until now, we have reserved the question of "[w]hether 'regulation' [preempted by the Act] must always be by way of public rule." *See id.* at 220. However, a growing number of our sister circuits acknowledge that the Act's preemptive reach can encompass common-law tort actions, in addition to statutes and ordinances. *See, e.g.*, *Tubbs v. Surface Transp. Bd.*, 812 F.3d 1141, 1145–46 (8th Cir. 2015); *Franks Inv. Co. LLC v. Union Pac. R.R. Co.*, 593 F.3d 404, 411, 413–14 (5th Cir. 2010) (en banc); *Emerson v. Kan. City S. Ry. Co.*, 503 F.3d 1126, 1128–30 (10th Cir. 2007). The Surface Transportation Board agrees. *See, e.g.*, *In re Tubbs.—Pet. for Declaratory Order*, FD 35792, 2014 WL 5508153, at *4 (S.T.B.

---

[12] Whether a law or action causes "unreasonable interference" is a fact-intensive inquiry that requires an "assessment of the effect of providing the claimed remedy," *PCS Phosphate*, 559 F.3d at 221—what other courts and the Surface Transportation Board have dubbed an "as applied" preemption analysis. *See, e.g.*, *Tubbs v. Surface Transp. Bd.*, 812 F.3d 1141, 1144 (8th Cir. 2015); *Franks Inv. Co. LLC v. Union Pac. R.R. Co.*, 593 F.3d 404, 414 (5th Cir. 2010) (en banc); *Holly Acres II*, 2016 WL 787578, at *3. However, because the tort claims at issue here are expressly preempted, an "as applied" analysis is unnecessary.

Oct. 29, 2014). And with the issue now squarely before us, we join in that sensible view. For "the obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *Kurns v. R.R. Friction Prods. Co.*, 565 U.S. 625, 637 (2012) (quoting *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959)). And the Act's express preemption clause—which "preempt[s] the remedies provided under . . . State law"—in no way distinguishes between statutory prohibitions and common-law duties. *See* 49 U.S.C. § 10501(b). "In such a situation," preemption of "'state law' cannot fairly be limited to positive enactments." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 523 (1992).

Of course, not *all* common-law claims against railroads are preempted. The Act's preemptive scope is limited with respect to statutes and tort actions to the same degree.[13] Our task, then, is to discern whether, in bringing the instant claims, Plaintiffs are actually "attempting to manage or govern rail transportation in a direct way." *See Franks*, 593 F.3d at 411.

The case of *Elam v. Kansas City Southern Railway Co.*, 635 F.3d 796 (5th Cir. 2011), provides helpful guidance. There, the plaintiff sued a railroad after driving her car into the side of a train that was stopped at a road crossing. *Id.* at 801. She brought two tort claims: a negligence *per se* claim based on Mississippi's antiblocking statute, which dictated the amount of time a train could occupy a road crossing; and a simple negligence

---

[13] *See generally Preemptive Effect of Interstate Commerce Commission Termination Act (ICCTA)*, 2 A.L.R. Fed. 3d Art. 3.

claim for failing to adequately warn of the train's presence at the crossing. *Id.* The Fifth Circuit held that the first claim—which directly implicated the railroad's scheduling decisions—was expressly preempted. *Id.* at 808. But the second claim, which was deemed to have only "incidental" effects on rail operations, was not. *Id.* at 813.

*Rushing v. Kansas City Southern Railway Co.*, 194 F. Supp. 2d 493 (S.D. Miss. 2001), is also helpful. The railroad there operated a noisy "switching station" in close proximity to the plaintiffs' home. *Id.* at 496. A "twelve-foot high earthen berm" was built to dampen the noise, but the berm caused rainwater to pool on the plaintiffs' property. *Id.* at 496, 501. The plaintiffs sued in negligence and nuisance, both to "eliminate the damaging vibrations caused by operations at the switch yard" as well as to restore "the natural flow and drainage of rainwater" that had been disrupted by the berm. *Id.* at 497. The court found that the first claim—which sought "to enjoin the [railroad] from operating its switch yard in the manner it currently employs"—was preempted by the Act. *Id.* at 500. However, the second claim—which dealt only with effects of the berm, rather than the railroad's switching activities—did not directly implicate subject matter within the Surface Transportation Board's purview and, therefore, was not preempted. *Id.* at 501.

With these cases and others as guideposts, we have no trouble concluding that Plaintiffs' tort claims are expressly preempted by the Act. Indeed, it is hard to view their claims as anything other than direct attempts to "regulate" railroading. Far from "incidentally" affecting rail construction and operation, the claims go to the heart of the Surface Transportation Board's exclusive jurisdiction: whether CSX should have allowed its tracks to be barricaded; whether CSX should have built a permanent floodgate over its

16

tracks at the gap; and whether CSX should have used different materials in constructing its track bed. *Cf. Franks*, 593 F.3d at 411 ("It is clear that a tort suit that attempts to mandate when trains can use tracks and stop on them is attempting to manage or govern rail transportation in a direct way."). Because all three tort claims "may reasonably be said to have the [desired] effect of 'managing' or 'governing' rail transportation," the district court rightly concluded that they are preempted. *PCS Phosphate*, 559 F.3d at 218.

Plaintiffs contend that their claims should not fall to express preemption because they are "not directed a[t] CSX *qua* railroad," but, rather, as "a landowner who just happens to be a railroad." Opening Br. at 41. To support this distinction, they rely in part on the Tenth Circuit's decision in *Emerson v. Kansas City Railway Co.* There, a railroad had disposed of old rail ties in a drainage ditch next to the plaintiffs' property. *Emerson*, 503 F.3d at 1128. Over time, the debris mixed with sediment to cause a blockage, which, in turn, flooded the plaintiffs' property. *Id.* When the plaintiffs eventually sued for trespass, nuisance, and negligence, the Tenth Circuit found that the Act did not expressly preempt their suits because the railroad's conduct was not "related to the movement of passengers or property" in any way. *Id.* at 1130 (quoting 49 U.S.C. § 10102(9)(A)-(B) (defining "transportation" for purposes of the Act)).

But *Emerson* is readily distinguishable from this case. Plaintiffs fault CSX for not closing an otherwise open rail line and for constructing a track bed with porous material. Those are things only a railroad can do. And that conduct is clearly encompassed by the plain language of the Act. *See* 49 U.S.C. § 10501 (assigning exclusive jurisdiction over "transportation by rail carriers" and "the construction . . . [and] operation . . . of . . . tracks"

17

to the Surface Transportation Board); *id.* § 10102(9)(A)–(B) (defining "transportation" as including "property . . . related to the movement of passengers or property, or both, by rail," as well as "services related to that movement"). Because "CSX is sued [here] for acts and omissions taken in its capacity as a railroad company, not simply a landowner," dismissal is proper.[14] J.A. 243.

As a final note, we acknowledge a commonsense objection to today's result: If a major storm threatens to inundate the gap—thereby preventing any trains from going through—wouldn't it be in CSX's interest to close it? Perhaps so. But while we sympathize with those seeking to end predictable flooding via the gap, we may not grant relief on a state-law claim that Congress has expressly preempted. Accordingly, we affirm the district court's dismissal of Plaintiffs' tort claims.

V.

---

[14] Plaintiffs submit that a pair of Surface Transportation Board decisions—referred to as the *Holly Acres* cases—counsel against dismissing their tort claims as expressly preempted prior to the start of discovery. They direct us to the Surface Transportation Board's statement there that, "in order to determine whether a party's claims are preempted—regardless of whether the defense is characterized as categorical or as applied preemption—the Board or a court must know the basic facts about the party's claims." *Holly Acres II*, 2016 WL 787578, at *4. But in context, it is clear that the Surface Transportation Board saw its role as simply providing "guidance" to the state court on the applicable law, and that the Surface Transportation Board was deferring to the state court on how to apply that law to the facts. *Id.* at *5. Here, the "basic facts" about Plaintiffs' tort claims *are* known—they're alleged clearly in the complaint, and, for present purposes, we accept them as true—and the district court ably applied the law of preemption to those facts. Nothing precludes a court from finding claims expressly preempted at the pleadings stage where, as here, a plaintiff specifically alleges that a railroad should have blocked its tracks or built them differently. *See, e.g.*, *In re Katrina Canal Breaches Consol. Litig.*, No. 07-4551, 2009 WL 224072, at *6 (E.D. La. Jan. 26, 2009) (dismissing claim that CSX had negligently designed, maintained, and constructed its track bed at the pleadings stage).

In sum, Plaintiffs have plausibly alleged that the Tri-Party Agreement was intended to directly benefit the class of persons to which they belong—the residents and businesses of South and West Lumberton left vulnerable to flooding through the gap. Dismissal of that claim was therefore premature. However, the district court rightly dismissed Plaintiffs' tort claims as expressly preempted by federal statute.

*AFFIRMED IN PART, REVERSED IN PART,*
*AND REMANDED*



J.A. 6. In this map, I-95 appears in purple, CSX's rail line is in dark blue, and the earthen barrier runs along the river in in gray.