**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 24-1399**

───────────────

ASSOCIATION OF AMERICAN RAILROADS,

        Plaintiff – Appellant,

    v.

JEHMAL T. HUDSON, in his Individual Capacity and Official Capacity as a
Commissioner of the State Corporation Commission of the Commonwealth of
Virginia,

        Defendant – Appellee,

and

STEPHEN BRICH, in his Individual Capacity and Official Capacity as the
Commissioner of the Virginia Department of Transportation; MICHAEL
ROLBAND, in his Individual Capacity and Official Capacity as the Director of the
Virginia Department of Environmental Quality,

        Defendants.

───────────────

Appeal from the United States District Court for the Eastern District of Virginia, at
Alexandria.  David J. Novak, District Judge.  (1:23-cv-00815-DJN-WEF)

───────────────

Argued:  January 29, 2025                         Decided:  July 18, 2025

───────────────

Before WILKINSON, HARRIS, and RUSHING, Circuit Judges.

───────────────

Affirmed in part, reversed in part, and remanded by published opinion.  Judge Harris wrote
the opinion, in which Judge Wilkinson and Judge Rushing joined.

**ARGUED:**   Raymond A. Atkins, SIDLEY AUSTIN, LLP, Washington, D.C., for Appellant.  Erika L. Maley, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee.  **ON BRIEF:**  Gordon D. Todd, Tobias S. Loss-Eaton, Lucas W.E. Croslow, Stephen S. Laudone, SIDLEY AUSTIN LLP, Washington, D.C., for Appellant.  Jason S. Miyares, Attorney General, Steven G. Popps, Chief Deputy Attorney General, Graham K. Bryant, Deputy Solicitor General, Rick W. Eberstadt, Deputy Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee.

PAMELA HARRIS, Circuit Judge:

This case involves a Virginia statute establishing streamlined procedures by which internet broadband service providers can access railroad property and lay cable across railroad tracks. The Association of American Railroads ("AAR") brought a pre-enforcement facial challenge, arguing that Virginia's law is preempted by federal statute and violates the federal Constitution's Takings Clause. The district court held that AAR lacked associational standing to bring either claim because both required the participation of AAR's individual member railroads. We agree that AAR's Takings Clause claim requires the participation of individual members but conclude that its preemption claim does not. Accordingly, we affirm the district court's judgment in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I.

The Association of American Railroads appeals the district court's dismissal of its challenge to Virginia Code § 56-16.3, titled "Fiber optic broadband lines crossing railroads." We first provide some background on the statutory scheme at issue. We then describe AAR's allegations and the district court decision now before us.

3

**A.**

1.

This case arises out of the Virginia General Assembly's efforts to increase broadband internet access throughout the Commonwealth.[1]  To expand access to rural communities, broadband service providers must install broadband cables across various kinds of property, including railroad property.  According to the plaintiff, a railroad trade association, its member railroads have long maintained policies and procedures that facilitate the installation of broadband cables while also ensuring that cable crossings are installed safely and do not interfere with railroad operations.  In the General Assembly's view, however, railroads were charging exorbitant fees for broadband cable crossings, and their processes were causing lengthy delays.  In response, the General Assembly enacted Virginia Code § 56-16.3, titled "Fiber optic broadband lines crossing railroads," which went into effect on July 1, 2023.

As its name indicates, § 56-16.3 applies only to railroads, giving broadband service providers a right of access to railroad property to install cables.  The statute is triggered when a broadband service provider "deems it necessary" to cross railroad property and applies to the railroad for such a crossing, Va. Code. § 56-16.3(B), identifying the relevant location and providing information including engineering plans and the proposed date of work, *id.* § 56-16.3(C)(1).  Although § 56-16.3 is similar in some respects to Virginia's

---

[1] The facts here are drawn from the operative complaint.

generally applicable eminent domain statute, *see id.* § 25.1-100 *et seq.*, it also includes several unique features.

First, the statute sets a strict timeline for action on a provider's application. Upon receipt of an application, a railroad company has only 15 days to request "additional information or clarification," *id.* § 56-16.3(C)(2)-(3), with a response due from the broadband provider within 10 days, *id.* § 56-16.3(C)(3). The railroad "shall approve" every application within 35 days of submission, unless it petitions the Virginia State Corporation Commission ("Commission") for relief on specified grounds. *See id.* § 56-16.3(C)(4) (35-day limit); *id.* § 56-16.3(H) (petition provision).

Section 56-16.3 also provides that the cost of crossings "shall be borne by the broadband service provider," *id.* § 56-16.3(G), and sets out a compensation scheme for affected railroads. The broadband provider must reimburse the railroad for direct expenses, up to $5,000. *Id.* It also must pay a "license fee." *Id.* For crossings within a public right-of-way, the fee is set at $0. *Id.* § 56-16.3(K). For crossings over railroad track that has been "legally abandoned," the fee is $1,000, *id.* § 56-16.3(I), and for all other crossings, the default fee is $2,000, *id.* § 56-16.3(G).

As noted above, a railroad may petition the Commission for relief pursuant to § 56-16.3(H) if it "asserts that [] the license fee is not adequate compensation." As AAR reads the statute, however, that provision applies only to the default $2,000 license fee set out in the preceding subsection (G), and not to the $1,000 fee for abandoned property or the $0 fee for public-right-of-way crossings in subsections (I) and (K). A railroad company also may petition on the ground that a proposed crossing will cause "undue hardship" for the

5

railroad or create an "imminent likelihood of danger to public health or safety." *Id.* § 56-16.3(H). If a petition raises only the adequacy of compensation – and not undue burden, public health, or safety concerns – then work on the crossing may proceed, with the Commission considering the compensation issue "after the commencement or completion of the work." *Id.* The service-provider applicant may also petition the Commission if it believes a railroad is out of compliance with the statute, and the Commission – with sole jurisdiction to hear and resolve claims between railroads and providers – shall issue a decision on all petitions within 90 days of filing. *Id.*

**B.**

1.

Acting in its representative capacity on behalf of its Virginia member railroads, AAR brought a pre-enforcement facial challenge to § 56-16.3. AAR raised two claims now before us on appeal: that Virginia's statute is preempted by the federal Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. § 10101 *et seq.*, and that Virginia's law violates the Takings Clause, U.S. Const. amend. V.

With respect to preemption, AAR argued, first, that § 56-16.3 singles out railroad property for its special procedures, discriminating on its face against rail carriers. Moreover, AAR alleged, application of § 56-16.3's new procedures would, in the aggregate, unduly burden rail transportation. On both those grounds, AAR claimed, § 56-16.3 is preempted by the ICCTA. As for the Takings Clause, AAR alleged that in every application, § 56-16.3 takes valuable easements from its member railroads without providing for just compensation. The license fees set out in the statute, AAR claims, are

6

"[g]enerally speaking" inadequate to fully compensate for these physical takings. J.A. 40. And allowing railroads to petition the Commission for additional compensation does not fix the problem, according to AAR, because the $0 and $1,000 fees for public-right-of-way and abandoned-property crossings operate as fixed caps, and because additional compensation for all other crossings will come, if at all, only after a taking and multiple proceedings.

In its complaint, AAR sought declaratory relief – a declaration that § 56-16.3 is void an unenforceable – and an injunction prohibiting the enforcement of § 56-16.3 against AAR's members.

2.

The defendants moved to dismiss AAR's complaint for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim pursuant to Rule 12(b)(6). After a hearing, the district court held, as relevant on appeal, that AAR lacked associational standing with respect to both its ICCTA preemption claims and its Takings Clause claim. *See Ass'n of Am. Railroads v. Hudson*, No. 1:23-cv-815 (DJN), 2024 WL 1626105, at *7-17 (E.D. Va. Apr. 15, 2024) ("*AAR*").[2]

Under Article III, the court began, an association like AAR may have standing to sue either in its own right or on behalf of its members. Here, AAR sought to sue in its

---

[2] The district court also dismissed other claims for failure to state a claim under Rule 12(b)(6), and held that sovereign immunity barred AAR's suit against all defendants other than Jehmal T. Hudson, who was the only member of the Commission at the time AAR's complaint was filed. AAR has not appealed those rulings.

7

"representational" capacity and on behalf of railroad members operating in Virginia. *Id.* at *7. That meant, the court explained, that AAR would have to satisfy a three-prong test set out by the Supreme Court, alleging that "(1) its members would otherwise have standing to sue in their own right; (2) the interests [the organization] seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at *7 (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). The first two prongs, the district court concluded, posed no obstacle to AAR's suit. *Id.* at *8 & n.5. But the third prong was fatal, the court held, because AAR's ICCTA preemption and Takings Clause claims required the participation of individual member railroads in the litigation. *Id.* at *13-14, *17.[3]

The district court began with ICCTA preemption. Whether AAR could litigate those claims without the participation of individual members, the court reasoned, turned on "the underlying merits of [its] facial ICCTA preemption challenge." *Id.* at *10. That was so, the court explained, because without a meritorious facial challenge, AAR could proceed only on an as-applied basis – which necessarily would require "individualized proof" available only if member railroads were party to the suit. *Id.* Turning to the merits,

---

[3] The district court did not expressly address the first prong of the representational standing test in analyzing AAR's Takings Clause claim. But it relied only on the third prong for its dismissal, *see* 2024 WL 1626105, at *15, and nobody disputes that AAR's members would themselves have standing to vindicate their own property rights under the Takings Clause, or that those property interests are germane to AAR's purpose. *See id.* at *8 & n.5.

the court then held that neither of AAR's preemption theories could support a facial challenge. AAR's allegation that § 56-16.3 discriminated against railroads invoked "implied" or "as-applied" – rather than "categorical" or "express" – preemption doctrine, foreclosing a facial challenge. *Id.* at *12-13 & n.10. And AAR's allegation that § 56-16.3's operation, in the aggregate, would impose an "unreasonable burden" on rail transit called for a "fact-intensive inquiry" necessarily inconsistent with a facial challenge. *Id.* at *14.

Likewise, the court held, AAR's Takings Clause claim could be litigated only with the participation of individual railroads, because that claim would require a "track-specific inquiry" as to the compensation due for each crossing. *Id.* at *15-16 & n.12. AAR had not alleged, the court explained, that the default license fees set out in § 56-16.3 would in every instance fall below a crossing's market value, nor that it always would be impossible for a railroad to obtain additional compensation through a petition to the Commission. *Id.* at *16 (emphasizing complaint allegation that default license fees would be inadequate "[g]enerally speaking"). Instead, railroads would have to separately "demonstrate the unavailability of just compensation for particular crossings." *Id.* That "fact-intensive process" made it impossible for AAR to show that there was "no set of circumstances" under which § 56-16.3 would leave a railroad without adequate compensation, foreclosing a facial challenge and "necessitating AAR member railroads' participation" in the suit. *Id.* *17 (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

9

Having found that AAR lacked standing to pursue its ICCTA preemption and Takings Clause claims, the district court dismissed those claims without prejudice for lack of jurisdiction under Rule 12(b)(1). *Id.* at *36. AAR timely appealed.[4]

## II.

We review a district court's dismissal for lack of standing de novo. *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 187 (4th Cir. 2018). When, as here, standing is challenged on the pleadings, we "accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party," *id.* (citation omitted), so

---

[4] While AAR's appeal was pending, the Supreme Court of Virginia issued two decisions interpreting § 56-16.3. *See Norfolk S. Ry. Co. v. State Corp. Comm'n*, 915 S.E.2d 305 (Va. 2025); *CSX Transp., Inc. v. State Corp. Comm'n*, No. 240872, 2025 WL 1467373, at *1 (Va. May 22, 2025) (unpublished). Both were brought by individual railroads, so neither involved the associational standing issue presented here. In this pair of cases, the railroads argued that § 56-16.3 was preempted by the ICCTA and violated the takings provisions of the Constitution of Virginia as well as the federal Constitution.

The Supreme Court of Virginia ruled for the railroads on state constitutional grounds without reaching the federal issues presented by this appeal. Specifically, the court held that as applied to a crossing application by a private, for-profit broadband service provider, § 56-16.3 violates Virginia's version of the Takings Clause because it allows the provider to "take railroad property for a nonpublic use" and does not require the provider "to establish the public use underlying the proposed taking." *Norfolk S. Ry. Co.*, 915 S.E.2d at 310. The court emphasized repeatedly that § 56-16.3 violated the Constitution of Virginia only "[a]s applied in this case," *id.* at 306, 310, 311, and we understand it to have left open whether the statute may be applied to a crossing application by a "government entity, public service corporation, or public service company," *id.* at 310. Accordingly, we agree with the parties – who have submitted letters regarding the decision – that the ruling of the Supreme Court of Virginia does not moot the case in front of us. We leave to the district court the question of whether and how that decision, which seems to significantly narrow the permissible scope of § 56-16.3, affects the merits of AAR's claims.

long as the allegations "state a claim to relief that is plausible on its face," *Nanni v. Aberdeen Marketplace, Inc.*, 878 F.3d 447, 452 (4th Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Having undertaken that review, we reverse the judgment of the district court as to AAR's preemption claims but affirm as to its Takings Clause claim.

**A.**

This is a standing case, so we begin by laying out the principles that guide the standing inquiry.  First, the district court correctly identified the three-pronged standard that governs AAR's claim to representational standing, requiring AAR to allege that its members would have standing to sue in their own right, that the interests it seeks to vindicate are germane to its mission, and that its claims can be litigated without the participation of individual members as parties to the suit.  *Hunt*, 432 U.S. at 343.  And we agree with the district court that the third prong – whether "the claim asserted [or] the relief requested requires the participation of individual members," *id.* – is the only one at issue here.

Second, the standing question is to be resolved separate from the merits of the case. Courts "must not confuse standing with the merits," and AAR's standing to bring a case "does not depend upon [its] ultimate success on the merits underlying [its] case." *Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 429 (4th Cir. 2007); *see Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal.").  For purposes of our standing analysis, that is, we must "accept as valid the merits of [AAR's] legal claims," *Fed. Elec. Comm'n v. Cruz*, 596 U.S. 289, 298 (2022), so long as they are plausible on their face, *see*

11

*Iqbal*, 556 U.S. at 678; *Nanni*, 878 F.3d at 452.  To the extent the district court rested its judgment on an assessment of the merits of AAR's claims, it was in error.

Finally, whether a legal question requires a fact-specific analysis is a separate question from whether an association may sue on behalf of its members.  It is not the case, as the district court may have assumed, that any fact-intensive inquiry will require the participation of an association's individual members as parties to a suit.  *Cf. AAR*, 2024 WL 1626105, at *14 ("[I]n light of the need for a fact-intensive inquiry in an as-applied analysis, such challenges necessitate participation by individual member railroads." (cleaned up)).  Sometimes, a court will be required to make factual judgments "regarding the nature and operation of [a statute] generally" – rather than the "specific operations" of an association's members – and in those cases, there is no need for individual members to join a suit to present individualized proof.  *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 187 (4th Cir. 2007).

Instead, whether member participation is necessary is more likely to turn on a factor the district court did not address:  the nature of the relief sought.  *See Warth*, 422 U.S. at 515 ("[W]hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought.").  An action for money damages may well "require examination of each member's unique injury."  *Retail Indus.*, 475 F.3d at 187.  But an action seeking prospective declaratory and injunctive relief – like the one before us today – is less likely to call for such particularized proofs, and is indeed the very "type of relief for which associational standing was originally recognized."  *Id.* (citing *Warth*, 422 U.S. at 515).

12

**B.**

We turn now to the claims at issue in this case, beginning with AAR's ICCTA preemption claims. AAR argues that it has standing to pursue, on behalf of its members, both of its preemption theories:  that the Virginia statute is preempted because it discriminates against railroads and because it unreasonably burdens rail transit in the aggregate. According to AAR, both these claims can be litigated without the participation of individual railroads as parties to this suit.

We agree. To be clear, we do not reach the merits of either of AAR's preemption claims. But we conclude that both can proceed without the participation of AAR's individual member railroads, and that AAR therefore has associational standing to pursue its preemption claims.

1.

We start with the basics on ICCTA preemption. Recognizing that "a uniform regulatory scheme is necessary to the operation of the national rail system," *Skidmore v. Norfolk S. Ry. Co.*, 1 F.4th 206, 217 (4th Cir. 2021), Congress enacted the ICCTA, establishing the Surface Transportation Board and giving it exclusive jurisdiction over "transportation by rail carriers," 49 U.S.C. § 10501(b). "Transportation" is broadly defined to include "property . . . related to the movement of passengers or property" and "services related to that movement." *Id.* § 10102(9). As we have explained, Congress made clear its intent to preempt state regulation of rail transportation, so defined, in the second sentence of § 10501(b):  "Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt

13

the remedies provided under Federal or State law." *Id.* § 10501(b); *see Skidmore*, 1 F.4th at 212-16.

The ICCTA "produce[s] both express and implied preemptive effects." *Edwards v. CSX Transp., Inc.*, 983 F.3d 112, 121 (4th Cir. 2020). State "regulation" of rail transportation – that is, a law or action "that may reasonably be said to have the effect of 'managing' or 'governing' rail transportation" – is expressly preempted. *Id.* (We also have used the term "categorical" to describe this form of preemption. *Id.* at 123 n.14.) But laws with a "more remote or incidental impact on rail transportation – think laws of general applicability, like local fire or plumbing codes – are not expressly preempted." *Id.* at 121 (internal quotation marks and citations omitted).

Instead, states and localities may apply regulations incidentally affecting railroads as a "proper exercise of police power" so long as those regulations do not "(1) discriminate against rail carriers, or (2) unreasonably burden rail carriage." *Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 160 (4th Cir. 2010). We call that an "implied preemption" analysis. *See PCS Phosphate Co., Inc. v. Norfolk S. Corp.*, 559 F.3d 212, 220-21 (4th Cir. 2009); *Edwards*, 983 F.3d at 121. And in part because the "unreasonable burden" prong of this standard calls for a "fact-intensive inquiry" into the effects of a given regulation, we also have "dubbed [that] an 'as applied' preemption analysis." *Edwards*, 983 F.3d at 121 n.12.

## 2.

We return now to the district court's holding that AAR lacks standing to litigate its discrimination-based preemption claim on behalf of its members. The district court

14

correctly identified AAR's discrimination claim as invoking a form of implied preemption. *See AAR*, 2024 WL 1626105, at *12.[5]  From there, it reasoned that AAR's claim could proceed only "as applied"; that this would require a fact-intensive inquiry, apparently into whether § 56-16.3 "unreasonably burdened" rail transport; and that such an inquiry would require the participation of individual AAR members.  *See id.* at *12-14, *13 n.10.  We disagree on all counts.

First, it is not the case that an ICCTA preemption claim based on discrimination may proceed only on an as-applied basis, rather than by way of a facial challenge.  The nomenclature here is confusing, to be sure.  As described above, courts have sometimes equated "implied preemption" under the ICCTA – the analysis that governs when a state or local law cannot be said to "regulate" rail transit – with an "as-applied" inquiry.  *See Edwards*, 983 F.3d at 121 n.12.  But that usage does not track the more familiar distinction between "facial" and "as applied" challenges to a law outside the ICCTA context, *see Salerno*, 481 U.S. at 745 & n.3, and it does not foreclose the possibility of a facial discrimination claim under the ICCTA.

In practice, of course, many ICCTA discrimination claims *will* proceed on an as-applied basis, because what they are challenging is a facially neutral and generally applicable regulation that is allegedly being applied in a discriminatory manner, or "as a

---

[5] AAR argued before the district court that Virginia Code § 56-16.3 has the effect of "managing" or "governing" railroad facilities, implicating express ICCTA preemption. The district court rejected that claim, *AAR*, 2024 WL 1626105, at *10-12, and AAR does not return to it on appeal.

pretext for interfering with or curtailing rail service." *See N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 253 (3rd Cir. 2007); *see also, e.g.*, *Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 643 (2d Cir. 2005). But AAR's claim is different: Virginia's § 56-16.3 *on its face* applies only to railroads. We are aware of no similar case arising in this circuit – an ICCTA discrimination challenge to a state regulation that expressly singles out railroads for separate treatment – and nothing in our caselaw should be understood to foreclose the possibility of a facial challenge to such a regulation.

The district court also erred in reasoning that AAR's discrimination challenge would entail the kind of fact-specific inquiry that would in turn require the participation of AAR's members in this litigation. It is not the case, as the district court seems to have assumed, that AAR can prevail on its discrimination claim only if it also shows that § 56-16.3 "unreasonably burdens" rail transit. *See AAR*, 2024 WL 1626105, at *13 n.10. A state law that does not "regulate" railroads is still impliedly preempted if it discriminates against rail carriers *or* unreasonably burdens rail transit; either one is enough to take the law outside the scope of permissible police powers. *City of Alexandria*, 608 F.3d at 160. So AAR's discrimination-based challenge to § 56-16.3 will not entail any evaluation – fact-specific or otherwise – of the degree to which Virginia's law burdens railroad operations.[6]

---

[6] The district court doubted that the preemption doctrine's "anti-discrimination prong" could be a standalone basis for implied preemption, noting that our decisions in *PCS Phosphate* and *Edwards* identified only the "unreasonable interference" prong in describing ICCTA implied preemption. *AAR*, 2024 WL 1626105, at *13 n.10. But that is because the plaintiffs in *PCS Phosphate* and *Edwards raised* only "unreasonable interference" claims; neither plaintiff alleged discrimination, so in neither case was there occasion to discuss it. *See PCS Phosphate*, 559 F.3d at 214; *Edwards*, 983 F.3d at 122. (Continued)

16

It will, to be sure, require *some* factual inquiry. As noted above, § 56-16.3 – titled "Fiber optic broadband lines crossing railroads" – applies to railroad property and only to railroad property. But that is not enough for AAR to prevail on its facial discrimination challenge. As AAR acknowledges, it will also have to show that § 56-16.3 treats railroads differently than similarly situated property owners. *See N.Y. Susquehanna*, 500 F.3d at 256. For now, it is enough for AAR to allege that § 56-16.3 imposes more onerous requirements on railroads than are imposed "for broadband service crossings over roadways or other non-railroad property." J.A. 32; *see Woods v. City of Greensboro*, 855 F.3d 639, 650 (4th Cir. 2017) (noting, in race discrimination context, that whether purported comparators are sufficiently similarly situated generally is not determined at pleading stage). But the defendant argues that as a factual matter, there *is* no similarly situated "non-railroad property," because railroad land holdings occupy a "unique" position with respect to expanding (or frustrating) broadband access in rural areas. That is a fact-dependent dispute between the parties, and how to resolve it will turn on evaluation of a factual record.

But this is where it matters that not every factual inquiry requires the participation of an association's members, as we emphasized at the outset. *See Retail Indus.*, 475 F.3d

---

And our reasoning in *City of Alexandria*, 608 F.3d at 160 – state laws that *either* discriminate against *or* unduly burden railroads fall outside the scope of permissible police powers under the ICCTA – is consistent with a consensus among the courts, with which the Surface Transportation Board agrees. *See Green Mountain*, 404 F.3d at 643; *N.Y. Susquehanna*, 500 F.3d at 253-54; *Adrian & Blissfield R.R. Co. v. Vill. of Blissfield*, 550 F.3d 533, 541 (6th Cir. 2008); *Delaware v. Surface Transp. Bd.*, 859 F.3d 16, 18-19 (D.C. Cir. 2017); *CSX Transp., Inc.*, 2005 WL 584026, at *8 (S.T.B. Mar. 14, 2005).

at 187. Nothing about the parties' arguments here turns on the "specific operations" of AAR's railroad members, or requires that each of those members come forward as parties with particularized proof. *See id.* Instead, what is at issue is whether railroad property as a class poses some "unique" obstacle to broadband expansion, or whether § 56-16.3 singles out railroads, relative to similarly situated property owners, for disadvantageous treatment – a "judgment[] regarding the nature and operation of the [Virginia statute] generally." *See id.* That issue can be litigated by AAR on behalf of its members and without requiring that member railroads themselves be parties to the case.

3.

We reach the same conclusion with respect to AAR's second preemption argument: that § 56-16.3 is impliedly preempted by the ICCTA because its application, cumulatively and in the aggregate, will unreasonably interfere with rail transportation in Virginia. *See, e.g.*, *Edwards*, 983 F.3d at 121 ("State laws and actions may be *impliedly* preempted if, in application, they have the effect of unreasonably interfering with railroad transportation." (cleaned up)). It is true, as the defendant argues, that we have often described the "unreasonable interference" analysis as a "fact-intensive inquiry," *see, e.g.*, *id.* at 121 n.12, requiring a careful "assessment of the effect" of a challenged regulation or action, *id.* (quoting *PCS Phosphate*, 559 F.3d at 221). But again, not every factual inquiry is the same when it comes to representational standing, and we think the inquiry called for by AAR's "aggregate" preemption claim can be undertaken without making AAR's individual members parties to this suit.

18

AAR's core allegation here is that application of § 56-16.3 in the aggregate – that is, to the whole series of service-provider requests for crossings – will produce a cumulative burden on rail transit that amounts to "unreasonable interference." *AAR*, 2024 WL 1626105, at *14. The process is too rushed to ensure that crossings are properly engineered and safely located where they will do the least harm to railroad operations, AAR says, and the statute does not appear to allow for relocation if future railroad needs so require. The result, AAR alleges, will be "death by a thousand cuts," with the statute's combined applications unreasonably burdening rail transportation.

Whether that allegation bears out will indeed require a "fact-intensive inquiry." But that inquiry will be into § 56-16.3's effect on rail transportation as a whole, not into the burden it imposes on any particular railroad at any particular crossing. Given the unusual nature of AAR's challenge, in other words, there seems to be no need for "proofs particular to individual members" or an "examination of each member's unique injury." *Cf. Retail Indus.*, 475 F.3d at 187. Instead, the factual question is the impact of Virginia's statute on rail transit writ large – and an industry trade association should be well-positioned to present facts related to a statute's cumulative effect on the industry it represents. Because litigation of AAR's claim does not "require[] the participation of individual members," *Hunt*, 432 U.S. at 343, AAR has standing to pursue its unreasonable-burden theory of ICCTA preemption, too.

We caution, however, that as we said at the start, a determination respecting standing should not be confused with a judgment on the merits. *See, e.g.*, *Covenant Media*, 493 F.3d at 429. Much of the defendant's argument on this point is really a merits

19

argument: that AAR's "aggregate" theory of unreasonable interference is not a cognizable ground for ICCTA preemption, and that even if it is, AAR's pre-enforcement challenge should fail as premature. *See AAR*, 2024 WL 1626105, at *14 (suggesting that AAR's claim is too "speculative" to support relief in a pre-enforcement posture). We express no view on those issues, or on any other related to the merits of AAR's argument, leaving those questions to the district court on remand. We hold only that AAR has standing to raise this preemption claim on behalf of its individual members.

## C.

We turn finally to AAR's claim that § 56-16.3, on its face, violates the Takings Clause by denying just compensation for the takings it approves. Here, we agree with the district court that AAR's Takings Clause claim will turn on the kind of individualized proof that requires the participation of its members in this suit, leaving AAR unable to meet the third prong of the *Hunt* test for representational standing. *See AAR*, 2024 WL 1626105, at *15-16.

Some of this is common ground. We agree with the district court – and do not understand the defendant to dispute – that AAR "properly fashioned its takings claims as pertaining to a *per se* physical taking," which always requires just compensation. *Id.* at *15; *see id.* ("The government's installation of any physical item on private property qualifies as a physical taking, giving rise to a *per se* takings claim."). And we think it is clear – and AAR is not arguing otherwise – that determining the *amount* of just compensation for any given taking, in the form of a crossing at railroad property, would require individualized proof from AAR's members. *Cf. Retail Indus.*, 475 F.3d at 187

20

(explaining that calculating damages requires "examination of each member's unique injury").

What is disputed is whether AAR can avoid this need for individualized proof – and hence for individual member participation – by bringing its Takings Clause claim as a facial challenge, and alleging that § 56-16.3 falls short of providing adequate compensation in *every* application. *See Salerno*, 481 U.S. at 745. According to AAR, it has adequately alleged just that, asserting that the schedule of statutory fees set out in § 56-16.3 will *always* fall short of the market value of a crossing. And the right to petition the Commission for additional compensation, AAR asserts, will *always* be insufficient to close this gap, because some of those statutory fees – $0 for a crossing over a public right-of-way, $1,000 for a crossing over abandoned property – are fixed caps, and even the $2,000 default can be supplemented by the Commission only after extensive litigation and delay.

We may assume, for purposes of our decision, that AAR has adequately alleged this theory in its complaint.[7]  And we take as true, for purposes of our standing inquiry, AAR's reading of § 56-16.3, under which no additional compensation is available for the $0 and $1,000 categories of crossings. *See Fed. Elec. Comm'n*, 596 U.S. at 298.[8]  Even so, it

---

[7] The district court thought otherwise, reading AAR's allegation that the statutory fees will fall below market value "[g]enerally speaking" to "implicitly concede[] that instances will arise where the statutory caps suffice." *AAR*, 2024 WL 1626105, at *16. AAR argues that its use of "generally" referred only to the facial nature of its challenge, and that the district court improperly failed to construe the complaint in its favor. We need not resolve that issue here.

[8] The defendant, to be sure, strenuously disputes that reading, insisting that § 56-16.3 allows the Commission to provide additional compensation, beyond the statutory fees, (Continued)

remains the case, as the district court concluded, that to prevail on its facial challenge, AAR ultimately will have to prove that there is no crossing at a public right-of-way or abandoned track for which just compensation "amount[s] to *less* than (or equal to)" these "fixed caps." *AAR*, 2024 WL 1626105, at *16. And we agree with the district court that this kind of "property-specific" factual inquiry will require the participation of AAR's individual members. *Id.*

To prove its facial preemption claims, as we have discussed, AAR will need evidence about the "nature and operation of [§ 56-16.3] generally," *Retail Indus.*, 475 F.3d at 187 – evidence showing that Virginia's statute puts railroad property, as a class, at a disadvantage compared to similarly situated property, or that in the aggregate its applications unreasonably interfere with railroad transit in Virginia. AAR can produce that evidence itself. But to prove that *every* crossing approved under § 56-16.3 will call for compensation in excess of the statute's fee schedule, AAR will need more particularized proof, tied to different types of railroad property and to "particular crossings with varied market values." *AAR*, 2024 WL 1626105, at *16 n.14. Imagine, for instance, that to rebut AAR's facial Takings Clause claim, the defendant points to several parcels of abandoned railroad property and argues that just compensation for a crossing at those parcels would be $1,000 or less. To prevail, AAR would need evidence regarding those parcels and the right level of compensation for associated crossings – and that kind of individualized proof,

_____

in all cases. And on the merits, that view may prevail. But the statute is at least somewhat unclear on this point, making AAR's contrary reading plausible enough to be taken as true for standing purposes.

much like proof of injury in a damages suit, requires the participation of an association's individual members in a lawsuit. *See Retail Indus.*, 475 F.3d at 187; *Warth*, 422 U.S. at 515-16.

AAR also argues that § 56-16.3 violates the Takings Clause in every application because it allows the Commission to provide for additional compensation – above the statutory defaults – after a taking already has been executed. *See* Va. Code § 56-16.3(H) (providing that "the issue of compensation may be considered by the Commission after the commencement or completion of the work"). There are at least two problems with that contention. First, as discussed above, on AAR's own reading, the relevant provision applies only to one of three categories of affected railroad property – property that is neither a public right-of-way nor abandoned – so even if § 56-16.3(H)'s compensation scheme were invalid, it would not show that applications of § 56.16-3(I) and (K) violate the Takings Clause. And more fundamentally, there is no plausible claim that § 56-16.3(H) is invalid for failure to provide for instantaneous compensation. It is true, as AAR argues, that the right to just compensation arises at the moment of a taking. *See DeVillier v. Texas*, 601 U.S. 285, 291 (2024). But that does not mean that a state must provide for immediate compensation "or risk having its action invalidated." *Knick v. Twp. of Scott*, 588 U.S. 180, 185 (2019). On the contrary, "[s]o long as the property owner has some way to obtain compensation after the act, governments need not fear that courts will enjoin their activities." *Id.*; *see id.* at 202 ("Given the availability of post-taking compensation, barring the government from acting will ordinarily not be appropriate."). Section 56-16.3(H) provides a mechanism by which railroads can obtain just compensation for broadband

23

cable crossings, and that is sufficient, even if the petition process may involve more steps and proceed more slowly than the railroads would like.

Accordingly, we agree with the district court that litigation of AAR's claim that § 56-16.3 facially violates the Takings Clause requires the participation of AAR's individual members. We therefore affirm the district court's judgment that AAR lacks representational standing to present this claim.

## III.

For the reasons given above, we reverse the judgment of the district court as to AAR's ICCTA preemption claims, affirm the judgment of the district court as to AAR's Takings Clause claim, and remand for further proceedings consistent with this opinion.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED*